1  CROWELL & MORING LLP
   J. Daniel Sharp (CSB No. 131042, dsharp@crowell.com)
2  Anne W. Kuykendall (CSB No. 248720, akuykendall@crowell.com)
   275 Battery Street, 23rd Floor
3  San Francisco, CA  94111
   Telephone: 415.986.2800
4  Facsimile: 415.986.2827

5  Attorneys for Defendant and Counterclaimant
   WDFA MARKETING, INC.
6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12 TECHSAVIES, LLC,                    Case No. CV-10-1213-BZ

13            Plaintiff and           **DEFENDANT AND**
             Counterclaim            **COUNTERCLAIMANT WDFA**
14            Defendant,              **MARKETING, INC.'S TRIAL BRIEF**

15       v.                           Pretrial Conference Date: April 27, 2011
                                      Time: 3:00 p.m.
16 WDFA MARKETING, INC.,              Judge: Hon. Mag. Judge Bernard Zimmerman
                                      Courtroom:  G, 15th Floor
17            Defendant and
             Counterclaimant.         Trial Date:  May 16, 2011
18

19

20

21

22

23

24

25

26

27

28

Crowell
& Moring LLP
Attorneys At Law

DEFENDANT AND COUNTERCLAIMANT
WDFA MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. FACTS ................................................................................................................. 4

    A. Parties ....................................................................................................... 4

    B. Prasad's Invention of an e-Commerce Website for the Sale of Print
       Advertising to MetroPCS Franchisees ...................................................... 4

    C. The Business Arrangement Between WDFA and Techsavies ...................... 5

    D. The Launch and Operation of the Website ............................................... 6

         1. Techsavies Failed and Refused to Sign a Written Agreement with
            WDFA ............................................................................................ 7

         2. Techsavies Secretly Arranged for a Written Assignment Agreement
            with Ace Website Design .................................................................. 7

    E. In 2009, Techsavies Made Extortionate Demands for Additional
       Compensation for the Software that WDFA Had Already Paid For ...................... 7

    F. Techsavies Announces Its Intent to Shut Down the "Collateralizer"
       Software, and WDFA Implements Replacement Software to Operate
       www.project632.com ................................................................................. 8

III. CLAIMS AND DEFENSES TRIABLE TO THE JURY AND TO THE COURT ........... 9

IV. CONTRACT CLAIMS ........................................................................................... 9

    A. Techsavies Will Be Unable to Prove that the Parties Orally Agreed to All
       Essential Terms of a Contract for Techsavies to Receive 40% of WDFA's
       Gross Revenues, or that WDFA Agreed to Have No Ownership or License
       to Use the Software ................................................................................ 10

    B. WDFA Will Easily Prove an Implied Contract that Included WDFA's
       Ownership or License to Use the Software for the Website ....................... 11

V. TECHSAVIES' CLAIM FOR PARTNERSHIP DISSOLUTION AND
   ACCOUNTING .................................................................................................. 12

    A. Techsavies Has the Burden of Showing that a Partnership Exists ............ 13

    B. Techsavies Is Not Entitled to a Jury Trial on its Claim for Dissolution and
       Accounting ............................................................................................. 14

VI. TECHSAVIES' COPYRIGHT CLAIM .................................................................. 16

    A. Techsavies Cannot Demonstrate That It Is the Rightful Owner of a
       Copyright in Either the "Collateralizer" or in the Administrative
       and Login Screens of WDFA's Website .................................................. 16

         1. Techsavies Does Not Even Claim to Own the Copyright in the
            Administrative and Login Screens of the Project632 Website ............... 16

         2. Techsavies Is Not the Rightful Owner of the Copyright to the
            "Collateralizer" Software .............................................................. 17

    B. Techsavies' Infringement Claim Is Barred by an Implied License ............ 17

         1. An Implied License Is Created Under State Contract Law ............... 17

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEFENDANT AND COUNTERCLAIMANT
WDFA MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1

**TABLE OF CONTENTS**
(continued)

2

Page

3
      2.      An Implied License Is Not Subject to an Artificial Pre-Condition of
      Delivery of Physical Possession ................................................................. 18

4
    C.    WDFA Did Not Copy the "Collateralizer" ........................................................ 21

5
      1.      The HTML Code Allegedly Copied by WDFA Is Not Protected By
      Copyright ................................................................................................... 22

6
      2.      The Allegedly Copied HTML Code Is *De Minimis* .................................. 24

7
    D.    WDFA Is a Joint Author and Therefore Cannot Be Liable
    for Copyright Infringement ...................................................................................... 24

8
    E.    Techsavies Infringement Claim Is Barred by Copyright Misuse ......................... 27

9
    F.    Techsavies Lacks Proof of any Copyright Damages ........................................... 27

10
VII.    TECHSAVIES' PROMISSORY ESTOPPEL CLAIM IS NOT TRIABLE TO A
JURY................................................................................................................................. 30

11
VIII.   TECHSAVIES' CLAIM FOR UNFAIR BUSINESS PRACTICES IS NOT
TRIABLE TO A JURY ..................................................................................................... 31

12
IX.    TECHSAVIES' CLAIM FOR "UNJUST ENRICHMENT" IS PREEMPTED BY
THE COPYRIGHT ACT .................................................................................................. 31

13
X.     WDFA'S FRAUD CLAIM ................................................................................................ 32

14
XI.    WDFA'S INTERFERENCE CLAIM ............................................................................... 33

15
XII.   CONCLUSION ................................................................................................................... 34

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-ii-

DEFENDANT AND  COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF; CASE NO. CV-10-
1213-BZ

SFACTIVE 106077.0000001\902268029.2

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
166 F.3d 772 (5th Cir. 1999); ............................................................. 27

*Apple Computer, Inc. v. Microsoft Corp.,*
35 F.3d 1435 (9th Cir. 1994) ........................................................ 21, 24

*Assessment Tech. of WI, LLC v. Wiredata Inc.,*
350 F.3d 640 (7th Cir. 2003) ........................................................ 27, 28

*Asset Marketing Systems, Inc. v. Gagnon*
542 F.3d 748, 754-56 (9th Cir. 2008) ................................. 2, 12, 19, 21

*Blue Nile, Inc. v. Ice.com, Inc.,*
478 F. Supp. 2d 1240 (W.D. Wash. 2007) ............................................ 32

*Bouchat v. Baltimore Ravens Football Club,*
346 F.3d 514 (4th Cir. 2003) .............................................................. 29

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,*
174 F.3d 1036 (9th Cir. 1999) ............................................................. 20

*Cargill Inc. v. Progressive Dairy Solutions, Inc.,*
362 Fed. Appx. 731, 2010 WL 178714 (9th Cir. 2010) ........................ 32

*Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991) ........................... 25, 26, 27

*Comp. Assocs. v. Altai*, 982 F.2d 693 (2d Cir. 1992) ............................... 24

*Dardovitch v. Haltzman*, 190 F.3d 125 fn.1 (3d Cir. 1999)) ...................... 15

*Del Madera Orios v. Rhodes and Gardner, Inc.*
820 F.2d 973 (9th Cir. 1987) ................................................................ 24

*Effects Associates Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ........... 18, 21

*Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*
122 F.3d 1211 (9th Cir. 1997) ............................................................. 11

*Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ............... 23

*Foad v. Consulting Group, Inc. v. Musil Govan Azzalino*
270 F.3d 821 (9th Cir. 2001) ....................................... 2, 18, 19, 21

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,*
886 F.2d 1545 (9th Cir. 1989) ............................................................. 30

*G.S. Rasmussen & Assos., Inc. v. Kalitta Flying Serv., Inc.,*
958 F.2d 896 (9th Cir. 1992) ............................................................... 32

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*
9 F.3d 823 (10th Cir. 1993) ................................................................. 23

*In re Lona*, 393 B.R. 1 (Bankr. N.D.Cal. 2008) ...................................... 13

*Jordan v. Paul Financial, LLC*, 2010 WL 2892261 (N.D. Cal. 2010) ....... 33

*Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326 (9th Cir. 1984) ...... 30

*Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998) ............... 17

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-i-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF; CASE NO. CV-10-
1213-BZ

SFACTIVE 106077.0000001\902268029.2

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134 (9th Cir. 2006) ................................. 32

4   *Lin-Brook Builders Hardware v. Gertler,* 352 F.2d 298 (9th Cir. 1965)...................................... 18

5   *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002)........................................................... 29

*MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F. 2d 511 (9th Cir. 1993) ...................... 16

6   *Masterson Marketing, Inc. v. KSL Recreation Corp.*,
    495 F. Supp. 2d 1044, 1049 n.5 (S.D. Cal. 2007)............................................... 29, 30

7   *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821 (2d Cir. 1994) ...................... 31

8   *Mitel, Inc. v. Iqtel, Inc.*, 124 F.2d 1366 (10th Cir. 1997)....................................... 23

9   *MZ Ventures LLC v. Mitsubishi Motor Sales,*
    1999 WL 33597219 at *11 (C.D. Cal. 1999)............................................... 31

10  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,*
    March 8, 2011, 9th Civ. 2011 WL 815806 ............................................... 20

11  *Newton v. Diamond*, 388 F.3d 1189 (9th Cir. 2009)........................................... 24

12  *Nimrod Mktg. (Overseas) Ltd. v. Texas Energy Inv. Corp.*,
    769 F.2d 1076 (5th Cir. 1985)............................................................... 31

13  *Palins Cotton Coop. Ass'n v. Goodpasture Com. Serv., Inc.*,
    807 F.2d 1256, 1262 & n.4 (5th Cir. 1987)............................................... 23

14  *Phillips v. Kaplus,* 764 F.2d 807 (11th Cir. 1985) ............................................... 15

15  *Polar Bear Prod. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004)....................... 28, 29, 30

16  *Practice Mgmt. Info. Corp.  v. Am. Med. Ass'n.*, 121 F.3d 516 (9th Cir. 1997) ........................ 27

*Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003)....................................... 22

17  *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
    531 F.3d 962 (9th Cir. 2008)............................................................... 25

18  *Schaefer v. Gunzburg*, 246 F.2d 11 (9th Cir. 1957)....................................... 16

19  *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ...................... 23

20  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977)............................................................... 21

21  *Siegel v. Warner Bros. Entertainment Inc.*,
    581 F. Supp. 2d 1067 (C.D. Cal. 2008)............................................... 15

22  *Sony Comp. Entm't v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000)............................................................... 23

23  *Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)............................................................... 21

24  *Sun Microsystems, Inc. v. Microsoft Corp.*
    188 F.3d 1115 (9th Cir. 1999)............................................................... 21

25  *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983)....................................... 29

26  *United States v. Louisiana,*
    339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950) ............................................... 15

DEFENDANT AND  COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF; CASE NO. CV-10-
1213-BZ

SFACTIVE 106077.0000001\902268029.2

**TABLE OF AUTHORITIES**
(continued)

Page

*Univ. of Colorado Found. v. Am. Cyanamid,*
   196 F.3d 1366 (Fed. Cir. 1999) .................................................................. 29

*Valente-Kritzer Video v. Pinckney,* 881 F.2d 772, 776 (9th Cir. 1989 ....................................... 33

*Video Pipeline v. Buena Vista Home Entertainment,*
   342 F.3d 191 (3d Cir. 2003) ..................................................................... 27

*Walker v. KFC Corp.*
   728 F.2d 1215 (9th Cir. 1984) ................................................................... 31

*Wall Data v. Los Angeles County Sheriff's Dep.,*
   447 F.3d 769 (9th Cir. 2006) .................................................................... 28

**STATE CASES**

*AB Group v. Wertin,*
   59 Cal. App. 4th 1022 (1997) ................................................................... 15

*A-C Co. v. Security Pacific Nat. Bank,*
   173 Cal. App. 3d 462 (1985) .................................................................... 31

*Berl v. Rosenberg,*
   169 Cal. App. 2d 125 (1959) .................................................................... 20

*Bowman v. Wyatt,*
   186 Cal. App. 4th 286 (2010) ................................................................... 20

*Bremner v. Leavitt,*
   109 Cal. 130 (1895) ............................................................................... 15

*BT-I v. Equitable Life Assurance Society,*
   75 Cal. App. 4th 1406 (1999) ............................................................... 2, 14

*C & K Eng'g Contractors v. Amber Steel Co., Inc.,*
   23 Cal. 3d 1 (1978) ................................................................................ 31

*Cel-Tech Commons, Inc. v. Los Angeles Cellular Telephone Co.,*
   20 Cal. 4th 163 (1999). ......................................................................... 31

*Conwell v. Gray Loon Outdoor Marketing Group,*
   906 N. E. 2d 805 (Indiana 2009) ............................................................. 19

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*
   43 Cal. 4th 375 (2008) .......................................................................... 14

*City of Los Angeles v. Superior Court,*
   51 Cal. 2d 423 (1959) ........................................................................... 10

*Del E. Webb Corp. v. Structural Materials Co.,*
   123 Cal. App. 3d 593 (1981) .............................................................. 18, 21

*Garcia v. Halsett,*
   3 Cal. App. 3d 319 (1970) ...................................................................... 20

*Hodge v. Superior Court,*
   145 Cal. App. 4th 278 (2006) .................................................................. 31

*Johnson v. Goldberg,*
   130 Cal. App. 2d 571 .............................................................................. 13

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

SFACTIVE 106077.0000001\902268029.2

**TABLE OF AUTHORITIES**
(continued)

Page

*Kasky v. Nike, Inc.,*
  27 Cal. 4th 939 (2002) ................................................................................................. 34

*Korea Supply Co. v. Lockheed Martin Corp.,*
  131 Cal. 4th 1134 (2003) ............................................................................................. 34

*Kransco v. Am. Empire Surplus Lines Ins. Co.,*
  23 Cal.4th 390 (2000) .................................................................................................. 12

*Lauriedale Assocs. Ltd. v. Wilson,*
  7 Cal. App. 4th 1439 (1992) ........................................................................................ 32

*Melchior v. New Line Prods., Inc.,*
  106 Cal. App. 4th 779 (2003) ...................................................................................... 32

*Moore v. Trott,*
  162 Cal. 268 (1912) ..................................................................................................... 21

*Navarro v. Perron,*
  122 Cal. App. 4th 797 (2004) ...................................................................................... 16

*Oakland Bank of Commerce v. Hayes,*
  159 Cal. App. 2d 257 (1958) ....................................................................................... 21

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
  50 Cal. 3d 1118 (1990) ................................................................................................ 34

*Prince v. Harting,*
  177 Cal. App. 2d 720 (1960) ....................................................................................... 15

*Raedeke v. Gibraltar Sav. & Loan Ass'n*
  10 Cal. 3d 665 (1974) .................................................................................................. 30

*Rosenfeld, Meyer & Susman v. Cohen,*
  191 Cal. App. 3d 1035 (1987) ..................................................................................... 15

*San Jose Construction Inc. v. S.B.C.C., Inc.,*
  155 Cal. App. 4th 1528 (2007) .................................................................................... 34

*Service by Medallion, Inc. v. Clorox Co.*
  44 Cal. App. 4th 1807 (1996) ...................................................................................... 33

*Smalley v. Baker*
  262 Cal. App. 2d 824, 837-838 (1968) ....................................................................... 13

*Steelduct Co. v. Henger-Seltzer Co.*
  26 Cal.2d 634 (1945) ................................................................................................... 13

*Stoll v. Selander,*
  81 Cal. App. 2d 286 (1947) ......................................................................................... 15

*Victor Valley Transit Authority v. Workers' Compensation Appeals Bd.,*
  83 Cal. App. 4th 1068 (2000) ...................................................................................... 13

*Weddington Prods., Inc. v. Flick,*
  60 Cal. App. 4th 793 (1988) ........................................................................................ 10

*Wolf v. Superior Court*
  107 Cal. App. 4th 25 (2003) ........................................................................................ 14

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE 106077.0000001\902268029.2

**TABLE OF AUTHORITIES**
(continued)

Page

**FEDERAL STATUTES**

17 U.S.C. § 101 ................................................................................................*Passim*

17 U.S.C. § 102 ................................................................................................ 24, 32

17 U.S.C. § 103 ........................................................................................................ 32

17 U.S.C. § 106 ........................................................................................................ 32

17 U.S.C. § 202 ........................................................................................................ 21

17 U.S.C. § 411(a) ................................................................................................... 17

17 U.S.C. § 504(b) ......................................................................................... 3, 28, 30

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17200 ......................................................................... 9, 31, 34

Cal. Bus. & Prof. Code § 17203 .............................................................................. 31

Cal. Civ. Code § 1619 ............................................................................................. 18

Cal. Civ. Code § 1621 ............................................................................................. 18

Cal. Civ. Code § 1710(4) ........................................................................................ 33

Cal. Civ. Code § 1550 ............................................................................................. 10

Cal. Civ. Code § 1580 ............................................................................................. 10

Cal. Civ. Code § 1636 ............................................................................................. 10

Cal. Corp. Code § 16201 ......................................................................................... 13

Cal. Corp. Code § 16202 ................................................................................... 2, 13, 14

Cal. Corp. Code § 16402 ......................................................................................... 16

Cal. Corp. Code § 16801(5) ............................................................................. 13, 15, 16

**OTHER AUTHORITIES**

1 B. Witkin, Summary of Cal. Law, Contracts, §§ 248 (9th ed. 1987) ...................................... 31

1 B. Witkin, Summary of Cal. Law, Contracts § 116 (10th ed. 2005) ...................................... 10

1 B. Witkin, Summary of Cal. Law, Contracts §§ 128, 133, 136 (9th ed. 1988) ........................ 11

9 B. Witkin, Summary of Cal. Law, Partnership § 22  (10th ed. 2005).................................... 13

California Judicial Council, Civil Jury Instructions (CACI) 305 ................................................ 18

4 Nimmer On Copyright § 14.03[B], 14-39................................................................................ 29

R. Jones & G. Rosen, Federal Civil Trials & Evidence, ¶ 2:64 at 2-11 (Rutter
    Group 2010) ......................................................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-v-

SFACTIVE 106077.0000001\902268029.2

## I.     INTRODUCTION

This case arises from a failed business relationship between Defendant and Counterclaimant WDFA Marketing, Inc. ("WDFA") and Plaintiff and Counterdefendant Techsavies LLC ("Techsavies").  The subject matter of the business relationship was the creation and operation of an e-commerce website called www.project632.com ("the Website").   WDFA came up with the idea for the Website as a means of selling print advertising materials to WDFA's client, MetroPCS and its franchisees.  WDFA hired Techsavies to provide "tech support" for the Website, specifically (1) to code the Website, i.e., to write computer code that would translate the design, images, and text supplied by WDFA into an interactive Internet website; (2) to secure a domain name and web address; and (3) to provide a computer server to host and maintain the Website.  Techsavies did all of these things and sent WDFA invoices for its services, which WDFA paid.  The total WDFA paid Techsavies for the Website was $454,601.00.

After the Website had been operating for two years and was shown to be successful, Techsavies took the position that Techsavies alone was the owner of the software used to run the Website.  Techsavies unilaterally started referring to the software as "the Collateralizer." (WDFA never used the term "Collateralizer" to refer to any software.)  Techsavies contended that WDFA had no right, permission, or license to use the Collateralizer software except upon such economic terms as Techsavies might choose to dictate.  Techsavies demanded that WDFA pay Techsavies $2 million to "buy" the software, or that WDFA execute a written contract to pay Techsavies periodic compensation at exorbitant rates.  Techsavies also threatened to sell the software for the Website to WDFA's competitors, who could destroy WDFA's business.  In other words, Techsavies sought to hold the Website hostage, threatening to shut down the software for the Website unless WDFA met Techsavies' demands.

The primary battleground in this case is whether Techsavies had the legal right to hold the Website hostage, either as a matter of California contract or partnership law, or as a matter of federal copyright law. The answer is clearly "no."

The bargain between Techsavies and WDFA was for WDFA to remain the owner of the Website and its component software.  At a minimum, the parties' bargain, and the course of

CROWELL
& MORING LLP
ATTORNEYS AT LAW

conduct that they engaged in for two years, gave rise to an implied contract to allow WDFA to use the software to operate the Website.  In copyright terms, this permission is referred to as an "implied license."  The existence of an implied license is a "contract question" that is determined by state law contract principles.  *Foad Consulting, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 826-27 (9th Cir. 2001).  An implied license that is supported by consideration is irrevocable. *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008).  Thus, as a matter of both contract law and copyright law, Techsavies had no right to suddenly withdraw permission for WDFA to use the software after WDFA had relied on the business arrangement for over two years, and had paid Techsavies substantial compensation.

As a matter of partnership law,[1] Techsavies had no right to make exorbitant economic demands to its co-partner WDFA, or to threaten to shut down the Website in an effort to force WDFA to capitulate to Techsavies' demands.  "[I]n all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind."  *BT-I v. Equitable Life Assurance Society*, 75 Cal. App. 4th 1406, 1410-11 (1999) (citation omitted).   In any event, the parties' business arrangement and conduct does not conform to the definition of a legal partnership under California Corporations Code 16202.

As to Techsavies' copyright claim, in addition to the bar of an implied license, Techsavies will be unable to establish either ownership of the applicable copyright or infringement.

As to ownership, Techsavies was not the author of the Collateralizer software, and cannot offer proof that the persons who actually wrote the code for the software have assigned their

---

[1] In its Complaint, Techsavies for the first time contended that it made an oral contract and/or oral partnership agreement with WDFA in October 2006, whereby WDFA was obligated to pay Techsavies 40% of the gross revenues from www.project632.com "in exchange for Techsavies developing, writing, and implementing the Collateralizer software."   (Complaint ¶¶ 47, 54.)  These allegations are unsupported by any documents, and are contrary to all of the invoices and written communications between the parties.  Techsavies will be unable to prove that the economic terms of the parties' business arrangement were more generous to Techsavies than the $454,601.00 that Techsavies invoiced and was paid by WDFA.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   ownership rights to Techsavies.  Second, any such assignment from the authors of the code would

2   have been in breach of Techsavies' contract with WDFA, under which WDFA was to remain the

3   owner of the Website and its component software.

4       As to infringement, WDFA had anticipated Techsavies' hostile action, and had

5   commissioned replacement software to run the Website.  The replacement software was created

6   without access to the Collateralizer software.  Techsavies has not shown, and cannot show, any

7   overlap in any protected elements in the two sets of code.  Thus, Techsavies will be unable to

8   prove copying of any protected element of the Collateralizer, which is an essential element of a

9   claim of infringement.

10      Techsavies' entire claim of copyright infringement is predicated, not on any similarity

11  between "the Collateralizer" software and the replacement software that WDFA now uses, but on

12  WDFA's "publishing and/or distributing" over the Internet the administrative and log-in screens

13  of the "live" Website.  (Complaint ¶ 30).  Techsavies takes the novel position that it can prove

14  that WDFA committed copyright infringement without showing that WDFA copied "the

15  Collateralizer," or even that WDFA had access to "the Collateralizer" and created a substantially

16  similar work.  The law is to the contrary.  WDFA did not commit copyright infringement.

17  Techsavies does not own (or even claim to own) the copyright to the screens and web pages on

18  www.project632.com.  Moreover, WDFA is a joint author of the screens and web pages, and of

19  the computer code associated with those web pages, whether the code is found on an Internet

20  browser or in "the Collateralizer."  A joint author cannot be liable for copyright infringement as a

21  matter of law.

22      Techsavies also will be unable to prove any copyright damages.  Techsavies has no actual

23  damages, and has made no effort to meet its burden of proving that WDFA earned profits that are

24  "attributable to the infringement" as required by 17 U.S.C. § 504(b) and Ninth Circuit precedent.

25      The only claims with any merit in this action are WDFA's counterclaims.  WDFA will

26  establish that Techsavies breached the covenant of good faith and fair dealing by attempting to

27  hold the Website hostage, which effectively required WDFA to pay for replacement software and

28  to suffer disruption to its business relationship with MetroPCS.  The jury will also find that

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-3-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

Techsavies committed fraud in its initial representations and promises that WDFA was to be the owner of the Website and its component software. By holding WDFA's customer data hostage, Techsavies intentionally interfered with WDFA's relationship with MetroPCS, and Techsavies is therefore liable for the increased expense that WDFA incurred in re-creating its database, and maintaining good relations with MetroPCS.

## II.     FACTS

### A.     Parties

Techsavies was started in 2006 by Bob Conner and Marouan Hajjoubi, who own the company 50/50. The company provides information technology services to businesses from a storefront location at 1040 Larkin Street in San Francisco.

Raj Prasad, the founder of WDFA, met Conner and Hajjoubi when he brought his computer to be repaired at Techsavies' shop at 1040 Larkin. Prasad was a recent graduate of Cal. State Hayward employed by an advertising agency called Overstreet Associates. Techsavies performed IT work for Overstreet as an independent contractor.

In the fall of 2006, Prasad left Overstreet Associates to start his own advertising agency, WDFA. He was 25 years old. In three years, he grew WDFA into a full-service advertising firm that employed 46 people.

### B.     Prasad's Invention of an e-Commerce Website for the Sale of Print Advertising to MetroPCS Franchisees

When he started WDFA, Prasad's anchor client was MetroPCS, the fifth largest wireless phone service provider in the United States. WDFA provided many advertising services to MetroPCS, including creating strategies for new ad campaigns, designing advertisements, and evaluating markets throughout the United States.

MetroPCS operates on a franchise business model. Each franchisee has different advertising needs and sometimes shares marketing costs with the franchisor, which retains ultimate control over content. WDFA sold print advertising to MetroPCS dealers by telephone, fax, and e-mail.

Prasad and a colleague, Jason Hilton, invented a system for selling and billing print

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-4-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   advertising to franchisees nationwide through an e-commerce website.  They created a

2   PowerPoint presentation, mock-ups of the web pages, HTML files, images, and text for the

3   website—each of which was a copyrightable expression.  The website design makes it easy and

4   efficient for the end user to purchase pre-approved print advertising.  Hilton and Prasad have

5   applied for a patent on the invention.

6           **C.      The Business Arrangement Between WDFA and Techsavies**

7           Prasad and Hilton needed software engineers to write the software to operate the website,

8   and also needed to arrange for a computer server to host the website once it "went live."  In

9   October 2006, Prasad met with Techsavies' owners, Bob Conner and Marouan Hajjoubi, to

10  determine whether Techsavies had such capabilities.  Conner and Hajjoubi said that they did.

11  Prasad asked them to prepare a written proposal for the initial work necessary to launch the new

12  website.  Prasad specifically insisted that the copyrights and other intellectual property associated

13  with his invention—including the software being commissioned from Techsavies—would belong

14  to WDFA.

15          Techsavies submitted a detailed "Proposal for Designing & Development of an E-

16  Commerce Website for Complete Automation of Order Processing" dated October 13, 2006 (the

17  "Proposal").   (TX 305.)[2]   The proposal identified Prasad of WDFA as the "client" and identified

18  Hajjoubi of Techsavies as an "IT consultant."

19          The Proposal accurately reflects the work that Prasad had asked for, and the estimated cost

20  of $30,000; however, the Proposal provided that materials provided by Techsavies are

21  "considered to be under a license agreement to be used by client for this project only."  Prasad

22  told Techsavies that this term was unacceptable.  Techsavies agreed that WDFA would be the

23  owner of the website and the computer code being commissioned from Techsavies.  (According

24  to Conner and Hajjoubi, they have no recollection of any discussion of copyright ownership in the

25  parties' initial discussions, and claim that they did not discuss copyright with WDFA until 2008.)

26  Thus, the evidence is either that the parties expressly agreed that WDFA would be the owner of

27  _____

28          [2] "TX" refers to Trial Exhibits that have been submitted to the Court in binders.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-5-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   the copyrights, or that Techsavies sent WDFA a writing saying that WDFA would have a

2   copyright license "for this project only" without further discussion or limitation.

3       Unbeknownst to WDFA, neither Conner nor Hajjoubi was willing or able to write the

4   software that WDFA needed.  Conner and Hajjoubi's representations about Techsavies' abilities

5   had been false.  Techsavies secretly intended to "outsource" the writing of computer code to

6   subcontractors in India, who would charge a fraction of the amount that Techsavies was charging

7   WDFA.  Techsavies also had no intention of honoring their commitment that WDFA would

8   remain the owner of the website, and secretly intended to exploit the business arrangement if

9   there was an opportunity to do so.

10      **D.     The Launch and Operation of the Website**

11      Although the Proposal was not signed, WDFA proceeded to work together with

12  Techsavies to create www.project632.com ("the Website").  WDFA exercised complete control

13  over the project.  Conner and Hajjoubi looked to Prasad and other WDFA employees with respect

14  to every major decision, and Techsavies had no discretion to refuse to implement written and oral

15  changes required by WDFA.  WDFA provided all of the text and most of the graphics that were

16  incorporated into the Website.   Furthermore, WDFA had password access to the

17  www.project632.com control panel on Techsavies' server, through which WDFA employees

18  could make direct changes to the Website (and therefore to the HTML code).

19      Techsavies began submitting invoices to WDFA in March 2007.  Techsavies submitted 11

20  invoices totaling $64,349 for "website design" services in 2007.   None of the invoices refers to a

21  partnership, the sharing of profits or losses, or to the calculation of Techsavies' compensation as a

22  percentage of the revenues from the sale of advertising via www.project632.com.

23      Techsavies out-sourced the creation of the software to a company in India called Ace

24  Website Design ("Ace").

25      The Website "went live" in September 2007.  The login page carried a notice stating

26  "Copyright © 2006-2007.  All rights reserved WDFA Marketing."  (*See* TX 352, 327 at

27  WDFA000166045.)

28      In May 2008, Prasad sent Techsavies a proposed "Software Ownership and License

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-6-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

Agreement." (TX 002)  Techsavies did not sign the agreement and instead, within the same month, sent WDFA a proposed "Project632.com Maintenance Agreement" that called for a monthly fee of $7,500 and stated that it "constitutes the entire contract of the parties and supersedes any prior agreements." (TX *003 at* p. TS 00000328.)   The Maintenance Agreement does not refer to a partnership, the sharing of profits or losses, or to the compesating Techsavies based on a percentage of the revenues from the sale of advertising via www.project632.com.  The Maintenance Agreement is also silent regarding copyright ownership/licensing, and does not purport to place any limitations on WDFA's use of the software.

After Techsavies sent the proposed Maintenance Agreement, Techsavies began submitting invoices to WDFA for "monthly retainer for the Website maintenance for WDFA project632." (TX 355 at 1500023195.)  In all, Techsavies submitted invoices totaling $454,601.00 through November 2009 for services related to www.project632.com.   (TX 409.)  WDFA paid each of these invoices in full, and Techsavies stamped the invoices "paid."

**1.   Techsavies Failed and Refused to Sign a Written Agreement with WDFA**

In September 2008, WDFA sent Techsavies a revised form of "Maintenance Agreement for WDFA Marketing Project 632" as well as a draft "Software Customization Services Agreement for WDFA Marketing Project632 software." (TX 004.)  Like prior drafts, these proposed agreements do not reference a partnership, joint ownership, or sharing of profits and losses.  Both draft agreements provide that any custom software developed for www.project632.com is "the sole and exclusive property of WDFA Marketing, including but not limited to all copyrights."

Techsavies did not sign either of the agreements, and did not propose any alternative form of agreement, or object that the draft agreement failed to memorialize the parties' business deal.

**2.   Techsavies Secretly Arranged for a Written Assignment Agreement with Ace Website Design**

In November 2008, without telling WDFA, Techsavies sought and obtained a written agreement with Ace, whereby Ace purported to assign the copyright in the computer code for the Website to Techsavies.  Thereafter, without notifying or consulting WDFA, Techsavies began to

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-7-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

refer to the code for the Website as "The Collateralizer."   (WDFA never referred to the software for the Website as "The Collateralizer.")   Techsavies began to explore opportunities to sell or license "The Collateralizer" to third parties without telling WDFA.

**E.      In 2009, Techsavies Made Extortionate Demands for Additional Compensation for the Software that WDFA Had Already Paid For**

In March 2009, Techsavies unilaterally increased the monthly "maintenance fee" that it charged WDFA from $7500 to $12,000.  Techsavies submitted invoices in this amount, which WDFA paid in full.  (TX 408 at p. TS00023230)

In August 2009, Conner and Hajjoubi met with Prasad and demanded that WDFA pay Techsavies $2 million for continued use of the software for www.project632.com.  When Prasad replied that such a demand was outrageous, Conner and Hajjoubi demanded yet another increase in the "maintenance fees" paid by WDFA.   Prasad asked them to put their demand in writing.

On September 26, 2009, Techsavies sent Prasad a Non-Binding Letter of Intent ("LOI") "regarding WDFA's continued use under license from Techsavies of the Software."  (TX 390.) The LOI proposed increasing Techsavies' monthly fee to $27,000, plus an "up front" payment of $25,000, and referred to Techsavies as "your software vendor."  (*Id.*)   The LOI does not reference a partnership, joint ownership, or sharing of profits and losses.

Prasad responded that Techsavies' demands were extortionate, and he offered the alternatives of referring the matter to the police or to WDFA's attorney.  (TX 391.)  Hajjoubi of Techsavies replied, "We understand that you continue to be troubled by the fact that Techsavies owns the software that forms the basis of your companies [*sic*] phenomenal growth, and WDFA does not."  (TX 009)

Techsavies' response did not suggest that Techsavies and WDFA had ever been partners with fiduciary duties to a jointly-owned business; rather, Techsavies acted as if it had unlimited power to re-negotiate its business deal with WDFA on terms dictated by Techsavies, without regard to the parties' course of dealing, past discussions, or WDFA's payment of Techsavies' invoices.

Thereafter, the parties engaged counsel who attempted to negotiate a proposed

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-8-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1  "Technology Services Agreement," which was never finalized or signed.  (TX 393)

2        **F.**    **Techsavies Announces Its Intent to Shut Down the "Collateralizer" Software,**
3                **and WDFA Implements Replacement Software to Operate**
              **www.project632.com**

4        On November 20, 2009, Conner sent WDFA an ultimatum stating that Techsavies would

5  "discontinue providing any services to WDFA or operating any website used in connection with

6  the services including www.project632.com" unless WDFA signed an agreement acceptable to

7  Techsavies by December 31, 2009.  (TX 010.)

8        Faced with this ultimatum, WDFA on November 23, 2009, re-directed the URL

9  http://www.project632.com to a new server hosted by WDFA, rather than the server hosted by

10  Techsavies.  As a contingency plan, WDFA had engaged a computer programmer to create

11  custom software to replace the "Collateralizer" software written by Techsavies.  The replacement

12  software had been created without access to the "Collateralizer" software written by Techsavies.

13        Thereafter, Techsavies accused WDFA of copyright infringement.  (TX 012)  WDFA

14  offered to allow Techsavies to establish a "software escrow" to compare the "Collateralizer"

15  software with the replacement software commission from Banerjee.  (TX 013)  Techsavies did

16  not respond to this invitation.

17        In February 2010, Techsavies registered two versions of "The Collateralizer" with the US

18  Copyright Office.

19  **III.**    **CLAIMS AND DEFENSES TRIABLE TO THE JURY AND TO THE COURT**

20        Techsavies March 23, 2010, complaint alleges claims for (1) copyright infringement,

21  (2) dissolution of partnership and accounting, (3) unfair business practices under Cal. Bus. &

22  Prof. Code § 17200, (4) breach of contract, (5) promissory estoppel, and (6) unjust enrichment.

23        WDFA's Answer and Counterclaim filed May 13, 2010, alleges claims for (1) breach of

24  contract, (2) fraud, and (3) interference with business relations.   WDFA also raised the

25  affirmative defenses of (1) license, (2) joint work, (3) waiver, (4) estoppel, (5) unclean hands,

26  (6) copyright misuse, and (7) breach by Techsavies.

27        Most of the parties' claims and defenses are triable by jury.  However, three of

28  Techsavies' claims are purely equitable and must be tried to the Court rather than the jury.  These

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE\106077.0000001\902268029.2

are (1) partnership dissolution and accounting, (2) promissory estoppel, and (3) violation of California Business & Professions Code § 17200.   WDFA's affirmative defenses of unclean hands and estoppel are also triable to the Court and not to the jury.

All of the claims are discussed below.

## IV.   CONTRACT CLAIMS

By the time this dispute arose in late 2009, the parties had done business together for more than two years, and WDFA had paid Techsavies $454,601.00 pursuant to written invoices.   The parties' arrangement was contractual in nature:  money was paid by WDFA in consideration of work by Techsavies towards launching and maintaining the Website.

Both parties have alleged claims for breach of contract; however, the alleged contracts are quite different, and require different proof.

### A.    Techsavies Will Be Unable to Prove that the Parties Orally Agreed to All Essential Terms of a Contract for Techsavies to Receive 40% of WDFA's Gross Revenues, or that WDFA Agreed to Have No Ownership or License to Use the Software.

Formation of a contract requires "mutual consent" of both parties to all "essential terms." *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811-812 (1988); Cal. Civ. Code §§ 1550, 1580, 1636.  The essential terms of the contract must be "reasonably certain" according to objective evidence.  *Flick*, 60 Cal. App. 4th at 1811-12; *City of Los Angeles v. Superior Court*, 51 Cal. 2d 423, 433 (1959).  Whether a term is "essential" depends on its relative importance to the parties and whether its absence would make enforcing the remainder of the contract unfair to either party.  *Id.*

"The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe."  *Flick,* 60 Cal. App. 4th at 811; *see* 1 B. Witkin, Summary of California Law (Contracts) § 116 at p. 155 (10th ed. 2005).  "The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.'" *Flick,* 60 Cal. App. 4th at 811 (quoting Cal. Civ. Code, § 1580).

A plaintiff seeking to enforce an oral contract must come forward with "evidence of a

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE 106077.0000001\902268029.2

-10-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

final agreement, either in writing or in the conduct of the parties." *Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1225 (9th Cir. 1997) (citing 1 B. Witkin, Summary of California Law, Contracts §§ 128, 133, 136, 145 (9th ed. 1988)).  Here, Techsavies has offered no objective evidence whatsoever that the parties agreed that WDFA would pay Techsavies 40% of its gross revenues in perpetuity, or at all.   Techsavies' contract allegations raise numerous unanswered questions:  If the "deal" was for Techsavies to be paid 40% of gross revenues, why did Techsavies send over 80 invoices totaling $454,601.00?  Why did neither WDFA nor Techsavies ever reference the 40% "deal" in any e-mail or draft contract?

In addition, Techsavies claims that WDFA gained no intellectual property rights as a result of the parties' bargain.  However, the subject matter of the entire deal was "developing, writing and implementing the Collateralizer software."  Techsavies Complaint ¶ 54.  If the parties did not reach agreement on whether one or the other would have any ownership or whether WDFA would have license rights to use the software, then they failed to form a contract. *Weddington,* 60 Cal. App. 4th at 815 (where subject matter of agreement was use of proprietary material, "if there was no licensing contract, there was no contract at all.")  The ownership and use of the software is obviously an essential term of the transaction that was important to both parties:  that is what this case is all about.

Even crediting Techsavies' own witnesses, there was no express agreement that WDFA would receive no ownership or license to use the software.   Both Conner and Hajjoubi claim that they have no recollection of discussing copyright issues until 2008, at which point they claim that they "rejected" WDFA's view that WDFA owned the intellectual property associated with the Website.

The parties' lack of agreement on these essential terms may be the subject of a Motion for Judgment as a Matter of Law by WDFA.

Techsavies' contract claims are also subject to the affirmative defenses of waiver, estoppel, and unclean hands.  By submitting invoices and accepting payment of $454,601.00, Techsavies waived any claim that its compensation should be based on some other business arrangement with WDFA, or is estopped from so claiming.  Techsavies' attempt to hold the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-11-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

Website hostage, and withholding WDFA's customer data, amounts to "unclean hands" that should bar relief.

      **B.    WDFA Will Easily Prove an Implied Contract that Included WDFA's Ownership or License to Use the Software for the Website**

WDFA will have no trouble in proving to the jury that the contractual arrangement between the parties included WDFA's ownership of the intellectual property associated with the Website or, at a minimum, implied permission to use the Collateralizer software for www.project632.com.  That was the entire purpose of the parties' business arrangement, pursuant to which WDFA paid Techsavies $454,601.00.   As the Ninth Circuit observed in *Asset Marketing*, "it defies logic that AMS would have paid Gagnon for his programming services if AMS could not have used the programs without further payment pursuant to a separate licensing arrangement that was never mentioned." *Asset Marketing Sys, Inc. v. Gagnon*, 542 F.3d 748, 756-67 (9th Cir. 2008).  WDFA's "implied license" to use the software is discussed further in section VI.B on page 18 below.

As set forth in Paragraph 22 of the Counterclaim, the gravamen of WDFA's complaint is Techsavies' breach of the covenant of good faith and fair dealing.  California law implies in every contract a covenant of good faith and fair dealing that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Kransco v. Am. Empire Surplus Lines Ins. Co.,* 23 Cal.4th 390, 400 (2000).  A reasonable jury could find that Techsavies breached the covenant of good faith and fair dealing by secretly arranging the assignment of copyright from Ace Website Design to itself, by threatening to shut down the project632.com website, and by refusing to turn over WDFA's customer database.

Techsavies' exorbitant, unwarranted demands for <u>additional</u> compensation, together with its threats to cut off WDFA's access to the Website and disclose the system to WDFA's primary competitors and customers, and sequestering WDFA's customer data, all constitute actions in breach of the parties' contract.  Techsavies took the position that it would refuse to perform under its existing arrangement with WDFA unless WDFA capitulated to the condition that WDFA pay Techsavies a higher "maintenance fee" than the $12,000 monthly fee that WDFA was currently

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-12-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

paying.  (Tx 010.)  "Annexing an unwarranted condition to an offer of performance is a refusal to perform."  *Johnson v. Goldberg*, 130 Cal. App. 2d 571, 576 (citing *Steelduct Co. v. Henger-Seltzer Co.*, 26 Cal. 2d 634, 646 (1945).)  Such a refusal amounts to an "anticipatory breach."  *Id.* (quotation omitted).

## V.    TECHSAVIES' CLAIM FOR PARTNERSHIP DISSOLUTION AND ACCOUNTING

Count 2 of Techsavies' complaint pleads that a partnership has been in existence since 2006, and seeks "dissolution of the partnership by court decree, pursuant to subdivisions B and C of the California Corporations Code Section 16801(5)."  (Complaint ¶ 45)  Techsavies seeks "an accounting of profits and losses that occurred during the operation of the partnership business."  (*Id.* ¶ 46).

### A.    Techsavies Has the Burden of Showing that a Partnership Exists.

"[T]he burden of proving the existence of a partnership is on the party so alleging."  *Smalley v. Baker,* 262 Cal. App. 2d 824, 837-838 (1968); *see In re Lona,* 393 B.R. 1, 11 (Bankr. N.D.Cal. 2008) (same).

Like a corporation, a partnership "is an entity distinct from its partners."  Cal. Corp. Code § 16201; *see Victor Valley Transit Authority v. Workers' Compensation Appeals Bd.,* 83 Cal. App. 4th 1068, 1076 (2000) ("A joint venture is a distinct entity virtually identical to a partnership, and capable of contracting — that is, acquiring obligations — in its own name.").  In California, the rules governing a partnership are either found in a "partnership agreement" or in the Uniform Partnership Act of 1994.  Cal. Corp. Code 16103 ("To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership.")

California defines a partnership by statute as "an association of two or more persons to carry on as co-owners a business for profit."  Cal. Corp. Code § 16202 (emphasis added); *see Chambers v. Kay,* 29 Cal.4th 142, 150-151 (2002).  Thus, the existence of a partnership requires proof the partners agreed to jointly own and operate a business.  *Id.; see* 9 B. Witkin, Summary of California Law (Partnership) § 22 at p. 597 (10th ed. 2005) ("A partnership is 'an association of

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-13-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

two or more persons to carry on as co-owners a business for profit.'")  The fact that the parties called themselves "partners" does not, by itself, mean that the parties were in a legal partnership. *Smalley*, 262 Cal. App. 2d at 834.

Techsavies cannot meet these criteria.  Techsavies never co-owned any property with WDFA, and the jury therefore could not find a partnership between the two entities.  Indeed, Techsavies claims that Techsavies, and not WDFA or any alleged partnership, exclusively owns the "Collateralizer" at issue in this lawsuit.  If the parties had been partners under California law, this would have been a flagrant violation of Techsavies' partnership duties.  *BT-I v. Equitable Life Assurance Society*, 75 Cal. App. 4th 1406, 1414 (1999) (California prohibits one partner from acquiring rights adverse to the partnership).  In addition, there is no evidence of any agreement to share jointly in the losses associated with the Website.  The fact that Techsavies spent time on the Website is not evidence one way or another of whether it was partners with WDFA or whether it was an independent contractor.  Finally, WDFA, and not Techsavies, exercised control over the business venture that was www.project632.com.  While Techsavies held the code itself hostage, the actual business elements—what the website would do, how it would look, the deals it offered—were all dictated exclusively by WDFA.

Techsavies' allegation that the parties agreed to split the "gross revenues" from the Website does not tend to prove the existence of a partnership.  "The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived."  Cal. Corp. Code § 16202(c)(2).  Many forms of contract such as distribution agreements, franchise agreements, and employment agreements provide that all or part of one party's monetary consideration will be based on the other party's revenues or profits.  Such agreements do not create any fiduciary or partnership relationship.  *See Wolf v. Superior Court* (2003) 107 Cal. App. 4th 25, 31-32 (2003) (rejecting argument that "profit or revenue sharing agreements are inherently fiduciary in nature"); *accord City of Hope Nat'l Med. Ctr. v. Genentech, Inc.,* 43 Cal. 4th 375, 390-391 (2008) (agreeing with *Wolf*).  Hence, an oral discussion to share gross revenues does not raise a triable issue of fact as to the existence of a partnership.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-14-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

**B.    Techsavies Is Not Entitled to a Jury Trial on Its Claim for Dissolution and Accounting.**

If the jury does find a partnership between WDFA and Techsavies, however, the dissolution and accounting is an equitable matter to be tried by the Court, not the jury.  *See* Cal. Corp. Code § 16801(5); *AB Group v. Wertin*, 59 Cal. App. 4th 1022, 1028 (1997) ("[A] proceeding for a partnership dissolution and accounting is an equitable matter and . . . must be tested under equitable principles."); *Rosenfeld, Meyer & Susman v. Cohen,* 191 Cal. App. 3d 1035, 1061 (1987) (same).  The California Court of Appeal has explained:

> The practice in accounting suits is for the court to determine first whether an accounting is due and then either to take the account or make a reference for that purpose.  Where a reference will be required an interlocutory judgment is entered and the final judgment which follows the accounting determines the amount of the recovery.

*Stoll v. Selander*, 81 Cal. App. 2d 286, 294 (1947); *see also Bremner v. Leavitt,* 109 Cal. 130, 132-33 (1895) ("The whole subject matter in controversy between the parties, which includes all the partnership transactions of each and all the partners, is the subject of the adjudication, and the account and decree must include all these matters, and leave nothing open for future litigation or controversy.  Equity will not adjudicate causes piecemeal."); *Prince v. Harting*, 177 Cal. App. 2d 720, 736 (1960).

Federal law is in accord.  "An accounting is usually an equitable action and hence not jury triable."  R. Jones & G. Rosen, Federal Civil Trials & Evidence, ¶ 2:64 at 2-11 (Rutter Group 2010) (citing *U.S. v. Louisiana*, 339 U.S. 699, 706 (1950) and *Dardovitch v. Haltzman*, 190 F.3d 125, 134 fn.1 (3d Cir. 1999)); *see also Phillips v. Kaplus*, 764 F.2d 807, 814 (11th Cir. 1985) (Affirming denial of jury trial because "First and foremost, an accounting between partners has traditionally been considered an equitable form of action."); *Siegel v. Warner Bros. Entertainment Inc.,* 581 F. Supp. 2d 1067, 1073-74 (C.D. Cal. 2008) (no right to jury trial in action for accounting of profits between co-owners of copyright in *Superman* comics).

The fact that Techsavies' partnership claim is predicated on the same alleged oral agreement as Techsavies' claim for breach of an oral contract is immaterial to the right to jury trial on the claim for dissolution and accounting.  Techsavies could have pleaded a single claim

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE 106077.0000001\902268029.2

1  for breach of contract, which is an action at law triable to a jury.  However, Techsavies elected to

2  also plead a claim for dissolution and accounting, which is a separate equitable claim and remedy.

3  This was the precise holding of the California Court of Appeal in *Navarro v. Perron,* 122 Cal.

4  App. 4th 797, 801-802 (2004).  There, the plaintiff alleged that his partner breached a partnership

5  agreement to own and operate a duplex.  The trial court awarded money damages based on the

6  value of the duplex.  The Court of Appeal reversed, holding that the plaintiff partner "is not

7  required to accept an award of damages, but may elect to have the partnership dissolved by sale

8  of the partnership assets and distribution of the proceeds" under Corporations Code sections

9  16402 and 16801(5).  *Id.* at 799; *see also Schaefer v. Gunzburg*, 246 F.2d 11, 15 & fn. 10 (9th

10  Cir. 1957) (no Seventh Amendment right to jury trial where complaint pleaded claim for

11  partnership accounting).

12      Since there is an overlap in the factual issues, WDFA does not object to the jury deciding

13  the factual issue of whether or not the parties, in fact, formed a partnership.  However, Techsavies

14  is not entitled to ask a jury to perform an equitable accounting.

15  **VI.   TECHSAVIES' COPYRIGHT CLAIM**

16      "To prevail on a claim of copyright infringement, a plaintiff must prove ownership of a

17  copyright and a 'copying of protectable expression' beyond the scope of a license."  *MAI Sys.*

18  *Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517 (9th Cir. 1993) (citation omitted).

19      Techsavies' copyright claim fails because (1) Techsavies cannot establish that it is the

20  rightful owner of the copyright in the material that it has accused WDFA of copying, (2) WDFA

21  did not copy any protectable expression of the "Collateralizer" software, (3) WDFA had an

22  implied license to use the "Collateralizer" software for wwww.project632.com, and (4) WDFA is

23  a joint author who cannot be liable for copyright infringement of a joint work.

24      **A.   Techsavies Cannot Demonstrate That It Is the Rightful Owner of a Copyright**
         **in Either the "Collateralizer" or in the Administrative and Login Screens of**
25       **WDFA's Website.**

26      To prevail on its claim that WDFA has infringed the "Collateralizer," Techsavies must

27  first establish, as a threshold issue, that it holds a valid copyright in the material that WDFA is

28  accused of copying.  17 U.S.C. § 101.  It cannot do so.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1. **Techsavies Does Not Even Claim to Own the Copyright in the Administrative and Login Screens of the Project632 Website**

Techsavies' claim of copyright infringement is based on WDFA's alleged copying of HTML code on the administrative and login screens of the project632 Website.  (Complaint ¶ 30.)  Techsavies is not the author of the administrative and login screens and did not write the HTML code used to display those screens.  Therefore, Techsavies does not own the copyright to the screens.  Tehcsavites has not attempted to register such a copyright claim with the US Copyright Office.  Thus, the HTML code on the administrative and login screens of the project632 Website cannot serve as the basis for Techsavies' copyright claim.  17 U.S.C. § 411(a); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (infringement suit barred where plaintiff had not registered drawings that were allegedly infringed).

2. **Techsavies Is Not the Rightful Owner of the Copyright to the "Collateralizer" Software**

Techsavies received a copyright registration for the "Collateralizer" on February 24, 2010, after this dispute arose but before Techsavies filed its Complaint.  As part of its application, it claims that the work was "made for hire" by Ace Website Design in India.  Ace Website Design is not, however, the actual author of the computer code and therefore had no authority to assign any rights in that code to Techsavies as a work made for hire.  The actual authors are unknown. Documentary evidence indicates that Ace Website Design itself "outsourced" the writing of the code to one or more subcontractors.  (*E.g.,* TX 005, Assignment Agreement, TX 345)  Techsavies has no evidence that the persons who actually wrote the code ever assigned their authorship rights in the "Collateralizer" to Ace Website Design, which in turn purported to assign them to Techsavies.

More fundamentally, Techsavies is not the rightful owner of the copyright because Techsavies executed the Assignment Agreement with Ace in violation of Techsavies' contract with WDFA.

Thus, Techsavies cannot show by a preponderance of the evidence that it has a valid copyright in the "Collateralizer."

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEFENDANT AND COUNTERCLAIMANT WDFA MARKETING, INC.'S TRIAL BRIEF; CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

**B.      Techsavies' Infringement Claim Is Barred by an Implied License**

**1.      An Implied License Is Created Under State Contract Law**

Before Techsavies attempted to hold the Website hostage, it is undisputed that WDFA was publishing and distributing the administrative and login screens of the project632 Website, including the HTML code for those web pages.  Prior to attempting to hold the Website hostage, Techsavies had never claimed that WDFA lacked permission (license) to publish and distribute the administrative and login screens of the project632 Website, and in fact had said and done many things to lead WDFA to believe that WDFA had the right to publish and distribute the Website.  "[W]hen one person engages another, whether as employee or as an independent contractor, to produce a work . . . the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done."  *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965) (decided under the 1909 Copyright Act).

"A nonexclusive copyright license may be granted orally or by implication."  *Foad Consulting*, 270 F.3d at 826 (*citing Effects Assocs. Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990).  "[W]hile federal law answers the threshold question of whether an implied, nonexclusive copyright license can be granted (it can), state law determines the contract question: whether a copyright holder has, in fact, granted such a license."  *Foad Consulting,* 270 F.3d at 824.

California law holds that contractual rights can arise by implication from the conduct of the parties.  Cal. Civ. Code §§ 1619, 1621.  "Whether or not an implied contract has been created is determined by the acts and conduct of the parties and all the surrounding circumstances involved and is a question of fact."  *Del E. Webb Corp. v. Structural Materials Co.*, 123 Cal. App. 3d 593, 611 (1981); *see* California Judicial Council, Civil Jury Instructions (CACI) 305.

A reasonable jury could find that an implied license was created when WDFA requested the software, Techsavies agreed to provide it, WDFA paid for it, and WDFA enjoyed the use of the software in running the website.  *See Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990).  The software was, after all, only created because WDFA requested it.  The software is of no value except in connection with the web pages published on the Internet, since it is

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-18-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

software for an e-commerce website.  The nature of the transaction implies that WDFA has permission to use the software for its intended purpose.  *Foad,* 270 F.3d at 827 n.10 ("*Effects Associates* stands for the principle that a seller grants a buyer an implied license to use a product for the purpose for which the seller sold it to the buyer.")

### 2. An Implied License Is Not Subject to an Artificial Pre-Condition of Delivery of Physical Possession

On summary judgment, Techsavies argued that the existence of an implied license depends on the "essential element" of "delivery" of physical possession of a disc containing the computer code, or the installation of the code on a computer owned by WDFA, citing *Asset Marketing.*

In *Asset Marketing,* the defendant, Asset Marketing, hired an independent contractor, Gagnon, to create and install custom software on Asset Marketing's in-house computers.  *Asset Marketing,* 542 F.3d at 750.  Gagnon did what he was paid to do:  create the custom software and install it on Asset Marketing's computers.  *Id.*  The Ninth Circuit held that the objective evidence left no dispute of material fact requiring a trial, and that an implied license arose as a matter of law.

Here, unlike *Asset Marketing,* WDFA did not hire Techsavies to install software on WDFA's in-house computers.  WDFA hired Techsavies to procure custom software <u>and</u> procure a computer server to run the Website, <u>and</u> to install and maintain the software on the server that WDFA was paying for.  It is a standard practice for businesses to "outsource" the creation of a website to an independent contractor, and to arrange with such a third party to "host" the website on a server.  *See, e.g., Conwell v. Gray Loon Outdoor Mktg. Grp.*, 906 N. E. 2d 805, 810 (Indiana 2009).  Such businesses have no need to receive the software for their website on a disc, or to have the software installed on their in-house computers.  If they did receive the software on a disc, they would have no ability to use it without getting IT support—which is the reason that they hired the independent contractor in the first place.

The Ninth Circuit in *Asset Marketing* did not purport to legislate that an implied license in computer software can never arise unless the defendant asked to have the software installed on its

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-19-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1    in-house computers.  Indeed, it was immaterial to the *Asset Marketing* Court that the client could

2    not modify or even locate the source code to which the license pertained:

3
> Gagnon argues that even if he had installed the programs onto the
> AMS computers, he never delivered the source code so that AMS

4    
> could modify the code. If AMS did not have the right to modify the
> code, it may have infringed Gagnon's copyright by exceeding the

5    
> scope of its license. [citation]  Gagnon primarily points to AMS's
> inability to locate the code on its own computer systems after his

6    
> services were terminated to show that AMS did not possess the
> code.  But, as we explain below, Gagnon's conduct manifested an

7    
> objective intent to give AMS an unlimited license at the time of
> creation; thus, when he stored the source code at AMS, the code

8    
> was delivered.

9    *Asset Marketing,* 542 F.3d at 755-56.  As long as the client could use the code for its intended

10   purpose (*i.e.,* the client got what it paid for), the work was "delivered."

11        The Ninth Circuit has recently re-affirmed:  "We must be acutely aware of excessive

12   rigidity when applying the law in the Internet context; emerging technologies require a flexible

13   approach."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.* (March 8, 2011, 9th Cir.),

14   2011 WL 815806 (9th Cir. No. 10-55840, March 8, 2011) (quoting *Brookfield Commc'ns, Inc. v.*

15   *West Coast Entm't Corp*., 174 F.3d 1036, 1054 (9th Cir. 1999).)  This admonition is especially apt

16   to Techsavies' contention that the existence of an implied license depends on a myopic and

17   narrow search for an "essential element" of delivery of physical possession.  Under California

18   law, delivery of physical possession is not an element of a license.  In fact, a "license" is

19   distinguished from other legal relations such as "bailment" or "lease" on the ground that a license

20   does not require possession of the property that is the subject of the license.  *Garcia v. Halsett,* 3

21   Cal. App. 3d 319, 324 (1970) ("In order to constitute a bailment, possession of the article bailed

22   must be given or delivered to the bailee.  . . . . Appellant merely acquired a license to use the

23   washing machine and was not a bailee."); *see Bowman v. Wyatt,* 186 Cal. App. 4th 286, 324

24   (2010) ("the right to possession is a fundamental attribute of a lease or rental.")[3]

25        [3] California likewise does not require physical possession of a material object to
26   accomplish "delivery."  *See, e.g., Berl v. Rosenberg,* 169 Cal. App. 2d 125, 132-33 (1959)
     (holding that donor made a "delivery" of a joint, one-half interest in securities without transfer of
27   physical possession of the securities or anything else to the donee; "to a complete delivery no
     precise form of words and no particular character of act is necessary.") (quoting *Oakland Bank of*
28   *Commerce v. Hayes,* 159 Cal. App. 2d 257, 262 (1958) and *Moore v. Trott,* 162 Cal. 268, 274
     (Continued…)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-20-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   While delivery of a copyrighted work may provide a ready indicia of an implied license,

2   there is no reason in fact or law that physical possession of a copyrighted work should be the

3   "essential" talisman of an implied license.  Physical possession is not an attribute of copyright

4   ownership.  17 U.S.C. § 202 ("Ownership of a copyright, or of any of the exclusive rights under a

5   copyright, is distinct from ownership of any material object in which the work is embodied.")  If a

6   copyright can be *owned* without physical possession of the work, there is no reason that a license

7   should require delivery of physical possession.  *See Asset Marketing,* 542 F.3d at 755 n.4 (citing

8   17 U.S.C. § 202 and *Effects Assocs.,* 908 F.2d at 558 n.6).

9   "The purpose of copyright is to create incentives for creative effort."  *Sony Corp. of Am. v.*

10   *Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984).   The implied license doctrine recognizes

11   that, where the incentive for creative effort has already been provided in the form of a paid

12   commercial arrangement.   The contractor is not entitled to hold the customer hostage by

13   continually re-negotiating the commercial arrangement on terms dictated by the contractor, with

14   the threat of liability for infringement.   *Foad Consulting,* 270 F.3d at 835. The contractor's

15   remedy is to enforce the business deal it made with the customer.  "[A] copyright owner who

16   grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee

17   for copyright infringement and can sue only for breach of contract."  *Sun Microsystems, Inc. v.*

18   *Microsoft Corp.*, 188 F.3d 1115, 1121-22 (9th Cir. 1999) (citations omitted).

19   **C.    WDFA Did Not Copy the "Collateralizer"**

20   Copying is an essential element of a claim for infringement.  *Apple Computer, Inc. v.*

21   *Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).  "'Copying,' in turn, is said to be shown by

22   circumstantial evidence of access to the copyrighted work and substantial similarity between the

23   copyrighted work and defendant's work."  *Sid & Marty Krofft Television Prods., Inc. v.*

24   *McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977) (emphasis added).  The Ninth Circuit

25   applies an "inverse ratio" test, requiring "a lower standard of proof of substantial similarity when

26   

27   (1912.)  All that is required is that the grantor makes known his intention "from any or all of the circumstances."  *Id.* (quoting *Oakland Bank,* 162 Cal. App. 2d at 274.)  This standard is similar to the determination of an implied contract.  *See Del E. Webb Corp.,* 123 Cal. App. 3d at 611.

28   

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1    a high degree of access is shown." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003)

2    (quotation omitted).  However, in order to invoke the "inverse ratio" test, the plaintiff must have

3    *some* evidence of defendant's access to the copyrighted work.  *Id.* (affirming summary judgment

4    where non-moving plaintiff's "evidence as to proof of access is insufficient to trigger the inverse

5    ratio rule.").

6          The parties agree that WDFA's programmers created new, replacement software for

7    www.project632.com  without ever having access to the "Collateralizer."  *See* Joint Pretrial

8    Conference Statement, Undisputed Fact No. 11 [Docket No. 136].  Thus, Techsavies will be

9    unable to prove copyright infringement.

10         Techsavies has indicated that it intends to prove infringement of "the Collateralizer" by

11   proving that WDFA copied publicly-available HTML code for the login and administrative

12   screens of www.project632.com.  The only line of code that Techsavies has specifically identified

13   is as follows: "meta name="Author" content="AceWebsiteDesign.Com – A Complete IT Web

14   Outsourcing Solutions Provider Company, IT Web Outsourcing Solutions, Custom Web

15   Designer, Ecommerce Website Designer, Custom Shopping Cart Designer, Custom Template

16   Design, Project Management Company, sales@acewebsitedesign.com, Call +1(858)-201-6435."

17         HTML code has only one function: it describes how a web page looks.  The HTML code

18   for all web pages is publicly available.  To view the HTML code for a web page, one need only

19   click "view source" on his web browser.  By contrast, the "Collateralizer" resides on a server and

20   is not publicly available.  The Collateralizer is software that controls what the website actually

21   does, including how pages link to one another, how a customer orders and customizes advertising,

22   and how the website stores customer data in a custom database.  Techsavies does not allege that

23   WDFA directly copied any code from the "Collateralizer," which only makes sense given its

24   position that WDFA never had access to the "Collateralizer."

25         **1.     The HTML Code Allegedly Copied by WDFA Is Not Protected By**
               **Copyright.**

26

27         In addition to showing that the "Collateralizer" is copyrighted, Techsavies must show that

28   WDFA copied original, protected elements of the "Collateralizer."  17 U.S.C. § 101; *Feist*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-22-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1  *Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  This is the case because

2  "[c]opyrighted software ordinarily contains both copyrighted and unprotected or functional

3  elements."  *Sony Comp. Entm't v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000); *Gates Rubber*

4  *Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 833 n.7 (10th Cir. 1993) ("Unprotectable elements

5  of a [computer] program, even if copied verbatim, cannot serve as the basis for ultimate liability

6  for copyright infringement.").  "Computer programs are, in essence, utilitarian articles—articles

7  that accomplish tasks.  As such, they contain many logical, structural, and visual display elements

8  that are dictated by the function to be performed, by considerations of efficiency, or by external

9  factors such a compatibility requirements and industry demands. . . . In some circumstances, even

10  the exact set of commands used by the programmer is deemed functional rather than creative for

11  the purposes of copyright."  *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th

12  Cir. 1992).

13  As an initial matter, Techsavies will be unable to show that WDFA copied <u>any</u> element of

14  the "Collateralizer."  The parties agree that WDFA's programmers <u>never had access</u> to the

15  "Collateralizer" and wrote entirely new replacement software.  *See* Joint Pretrial Conference

16  Statement, Undisputed Fact No. 11 [Docket No. 136].

17  The HTML code on the "live" Website is composed primarily of standard, stock elements

18  that the coding convention dictates must be arranged in a specific manner.  *Mitel, Inc. v. Iqtel,*

19  *Inc.*, 124 F.2d 1366, 1374-75 (10th Cir. 1997) (stating that in copyright law, standard or stock

20  elements of a work—like a "dark alleyway" or a log in screen—are not protectable under the

21  *scenes a faire* doctrine).  Most aspects of the HTML code were dictated by external or industry-

22  specific factors, like WDFA's written pay layouts, the general requirements of a login or

23  administrator screen, or the color scheme used by MetroPCS in its proprietary trade dress.  *Id.*;

24  *Palins Cotton Coop. Ass'n v. Goodpasture Com. Serv., Inc.*, 807 F.2d 1256, 1262 & n.4 (5th Cir.)

25  1987, *cert denied*, 484 U.S. 821 (1987) (finding no infringement where two programs' similarities

26  were "dictated by the externalities of the cotton market").  Many aspects of the HTML code are

27  purely functional – such as the basic format of the login and administrator screens.  17 U.S.C.

28  § 102(b) (functional elements of a work not protected); *Comp. Assocs. v. Altai*, 982 F.2d  693 (2d

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-23-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1    Cir. 1992).  Finally, the one specific code fragment identified by Techsavies is not sufficiently

2    creative to be copyrighted, as it is the only way to convey the information is seeks to express.

3         When these unprotected elements of the HTML code are eliminated from consideration,

4    the jury will find that there are no protectable fragments of HTML code that WDFA allegedly

5    copied (and that if there are any, they are of so little importance to the "Collateralizer" that

6    WDFA should not be liable to copyright infringement under the *de minimis* doctrine, discussed

7    below).

8              **2.    The Allegedly Copied HTML Code Is *De Minimis***

9         Any protected elements of the HTML code that were allegedly copied by WDFA are of

10   too little importance to the "Collateralizer" to constitute copyright infringement.  As stated by the

11   Ninth Circuit, even where there is some copying, "the dispositive question is whether the copying

12   goes to trivial or substantial elements."  *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2009)

13   (copying brief and simple segment of composition de minimis).  "The analysis at this point 'poses

14   essentially a value judgment, involving an assessment of the importance of the material that was

15   copied.'"  *Apple Comp., Inc. v. Microsoft Corp.*, 821 F. Supp. 616, 623 (N.D. Cal. 1993).  Based

16   on all the facts and circumstances, a reasonable jury can decide that the HTML code for two web

17   pages is not a substantial element of the "Collateralizer."

18        **D.    WDFA Is a Joint Author and Therefore Cannot Be Liable for Copyright**
19            **Infringement**

20        Section 101 of the Copyright Act defines "joint work" as "a work prepared by two or

     more authors with the intention that their contributions be merged into inseparable or

21   interdependent parts of a unitary whole."  17 U.S.C. § 101 (emphasis added).  The "touchstone"

22   of joint authorship analysis is "the intention, at the time the writing is done, that the parts be

23   absorbed or combined into an integrated unit."  S. Rep. No. 94-473, at 103 (1975) (emphasis

24   added).

25        "Whether a work is a joint work, rendering a party a joint author, is often a question of

26   fact for the jury to determine."  Ninth Circuit Model Civil Jury Instructions, 17.7, Comment; *see*

27   *also Del Madera Orios v. Rhodes and Gardner, Inc.* 820 F.2d 973, 980 (9th Cir. 1987)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-24-                    DEFENDANT AND COUNTERCLAIMANT WDFA
                       MARKETING, INC.'S TRIAL BRIEF;
                       CASE NO. CV-10-1213-BZ
SFACTIVE 106077.0000001\902268029.2

1   ("Authorship is a question of fact.").  A reasonable jury could easily find that the Website

2   www.project632.com is a "unitary whole," comprised web pages containing images and text, a

3   site plan, and the software necessary to launch the webpages on the Internet according to the site

4   plan.

5   An author need only contribute a single copyrightable expression to enjoy all the benefits

6   of joint authorship.  *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir.

7   2008) ("Even if a person's contribution is minor, once he is accorded joint authorship status, he

8   enjoys all benefits of joint authorship").  For the website[4], however, WDFA contributed HTML

9   code, website flow plans, screen displays, images, text, sample databases, PowerPoint slides,

10   PhotoShop files, .swf files, text, written comments on web page printouts, and more.  Each of

11   these items was "reduced to writing."

12   The website is a unitary whole because the contributions of WDFA and Techsavies,

13   together, are inseparable or interdependent parts of  www.project632.com.  See 17 U.S.C. § 101.

14   Parts of a unitary whole are "inseparable" when "they have little or no independent meaning

15   standing alone."  *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1991.  Parts of a unitary whole

16   are "interdependent" when "they have some meaning standing alone but achieve their primary

17   significance because of their combined effect, as is the case of the words and music of a song."

18   *Id.*  HTML code – the only code allegedly copied by WDFA -- is not a computer program, but a

19   simple markup language that defines only the information that is conveyed <u>visually</u> when a user

20   looks at the web page on his or her computer screen, such as the background color, font size,

21   length and width of tables and boxes, and so forth.  (HTML code can be viewed by any visitor to

22   www.project632.com using the web browser's "view source" function).  As such, the HTML

23   code contained in Techsavies complaint is absolutely unique to www.project632.com's login and

24   administrator web pages, and for it to be of use to any other website (and therefore have

25   independent commercial value), it would have to be altered.  WDFA contributed text to the

26

27   [4] Even if the copyrighted work is defined more narrowly, as the computer code for www.project632.com, WDFA contributed HTML code and other independently copyrightable material to the work.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-25-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1  HTML code, which is found in Exhibit A to Techsavies' Complaint.  ("WDFA Marketing is

2  about successful campaigns, meeting deadlines, treating people well, and working hard. . . . ")

3  Techsavies' and WDFA's contributions have even less independent value than the music and

4  lyrics to a song, and yet a song is a prime example of a joint work of which the two elements are

5  interdependent parts.  *Childress*, 945 F.2d at 505 ("a novel and a song are among the examples

6  offered by the legislative committee reports on the 1976 Copyright Act to illustrate the difference

7  between 'inseparable' and 'interdependent' parts.").

8          Furthermore, a reasonable jury could find that the conduct of the parties evinces an

9  "intention, at the time the writing is done, that the parts be <u>absorbed</u> or <u>combined</u> into an

10  integrated unit."  Comment to S. Rep. No. 94-473, at 103 (1975) (emphasis added).  Techsavies

11  knew, from the beginning, that the entire purpose of the computer code that it was hired to write

12  was to put WDFA's pre-designed web site up on the web.  (E.g., TX 304 [October 13, 2006

13  Proposal for "an E-Commerce website"].)  Second, Techsavies requested and received

14  copyrightable materials from WDFA, including HTML code, as a necessary element of creating

15  the website, demonstrating its intent to integrate it into the final work.  Third, Techsavies told

16  Prasad that he would remain the owner of the web-based system, indicating Techsavies' intent

17  that the two parties' work would merge into a single product of which they would both be joint

18  authors.  Fourth, at the time of writing the Code, Ace Website Design on behalf of Techsavies

19  indicated that the "Collateralizer" was intertwined with WDFA and <u>www.project632.com</u>.  The

20  code copyrighted by the copyright office contain hundreds of references to project632 and WDFA

21  Marketing, including "Content = 'wdfamarketing.com, WDFA Marketing is about successful

22  campaigns, meeting deadlines, treating people well, and working hard. . .'" (See TX 151-52.)

23  Finally, WDFA both intended its contributions to be integrated into the site and directed

24  Techsavies to integrate them; WDFA's changes were in fact integrated into the site (indeed,

25  Techsavies had no discretion to refuse WDFA's direction).

26          Finally, granting Techsavies sole authorship of the code would defeat the very purpose of

27  the joint authorship doctrine.  It is well-established that copyrightable works—like

28  <u>www.project632.com</u>—can be composites of multiple copyrightable elements (e.g. screen

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-26-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   displays, text, images, and computer code).  *See, e.g., Childress*, 945 F.2d at 505.  To allow an

2   author of one component part of a creative work to separate out his contribution from the whole

3   and assert exclusive control over that part thwarts the aim of the joint work doctrine:  granting co-

4   authors of a "unitary whole" equal rights to the copyrighted work.  WDFA is a joint author of the

5   Website.  As a joint author, WDFA cannot be liable for copyright infringement.  17 U.S.C.

6   § 201(a) (1976) ("The authors of a joint work are co-owners of copyright in the work.").

7         **E.**    **Techsavies Infringement Claim Is Barred by Copyright Misuse.**

8         Copyright misuse exists where "the plaintiff is using the right asserted contrary to the

9   public interest."  *Video Pipeline v. Buena Vista Home Entertainment*, 342 F.3d 191, 204 (3d Cir.

10  2003).  Specifically, courts have found misuse where the plaintiff attempts to "indirectly gain

11  commercial control over products [Defendant] does not have copyrighted, often constituting

12  anticompetitive business practices.  *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 793 (5th

13  Cir. 1999); *see also Practice Mgmt. Info. Corp.  v. Am. Med. Ass'n.*, 121 F.3d 516, 520 (9th Cir.

14  1997) (finding copyright misuse where copyright license prohibited licensee from using

15  competing goods).

16        Techsavies attempted to use its alleged copyright to exert unilateral authority to shut down

17  www.project632.com, withhold WDFA's customer data, and sell WDFA's proprietary system to

18  its competitors.  WDFA alleges in its complaint that Techsavies exploited its alleged authority to

19  (a) extract ever-increasing maintenance fees from WDFA and (b) prevent WDFA from accessing

20  its customer data.  As stated by the court in *Assessment Tech. of WI, LLC v. Wiredata Inc.*, 350 F.

21  3d 640 (7th Cir. 2003):

22          This case is about the attempt of a copyright owner to use copyright
23          law to block access to data that not only are neither copyrightable
            nor copyrighted, but were not created or obtained by the copyright
24          owner.  The owner is trying to secrete the data in its copyrighted
            program—a program the existence of which reduced the likelihood
25          that the data would be retained in a form in which they would have
            been readily accessible.  It would be appalling if such an attempt
26          could succeed.

27  The court found copyright misuse based upon the fact that "[Plaintiff] is trying to use its

28  copyright to sequester uncopyrightable data, presumably in the hope of extracting a license fee

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-27-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   from [Defendant]." *Id.* at 645.  Techsavies' behavior thus constituted copyright misuse.

2        **F.      Techsavies Lacks Proof of any Copyright Damages**

3        Section 504(b) of the Copyright Act provides the sole means to obtain monetary remedies

4   for an infringement plaintiff who, like Techsavies, failed to register his copyright before the

5   alleged infringement.  A copyright owner is entitled to recover its actual damages and, to the

6   extent not duplicative of actual damages, disgorgement of any profits "that are attributable to the

7   infringement."  17 U.S.C. § 504(b).

8        General "tort principles of causation and damages" apply under section 504(b).  *Polar*

9   *Bear Prod. v. Timex Corp.*, 384 F.3d 700, 708-09 (9th Cir. 2004) ("Under § 504(b), actual

10  damages must be suffered 'as a result of the infringement,' and recoverable profits must be

11  'attributable to the infringement.'").

12       Techsavies has no evidence of any actual damages.  Actual damages means the amount of

13  money adequate to compensate the copyright owner for the reduction of the fair market value of

14  the copyrighted work caused by the infringement.  *Wall Data v. Los Angeles County Sheriff's*

15  *Dep.*, 447 F.3d 769, 786 (9th Cir. 2006).  Techsavies has put forward no expert testimony relating

16  to the fair market value of the "Collateralizer."  The only evidence of the value of the code in the

17  record is that amount that Techsavies paid to Ace Website Design to write the code.  This amount

18  is less than 10% of the $454,601.00 that Techsavies collected from WDFA.  Thus, Techsavies

19  will not be able to sustain its burden of showing actual damages.

20       Techsavies also will not be able to sustain its burden of showing profits "attributable to

21  the infringement" as required by 17 U.S.C. § 504(b).  The Ninth Circuit recognizes two types of

22  profits in copyright cases: direct profits and indirect profits.  *Mackie v. Rieser*, 296 F.3d 090, 913

23  (9th Cir. 2002); *Polar Bear Prods.,* 384 F.3d at 710.  Direct profits are profits that are "generated

24  by selling an infringing product." *Polar Bear Prods.*, 384 F.3d at 710.  Indirect profits, on the

25  other hand, "arise when the alleged infringer does not sell the copyrighted work itself but rather

26  uses the copyrighted work to sell another product."  *Masterson Marketing, Inc. v. KSL Recreation*

27  *Corp.*, 495 F. Supp. 2d 1044, 1049 n.5 (S.D. Cal. 2007); *Mackie*, 296 F.3d at 914.

28       There are no direct profits in this case.  WDFA never sold or licensed the "Collateralizer."

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-28-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1     To recover indirect profits, the plaintiff bears the burden of establishing a causal

2  relationship between the alleged infringement and the "gross revenue" that was generated

3  indirectly from such infringement.  *Mackie*, 296 F.3d at 915.  To do so, Plaintiff must present

4  evidence that the alleged infringement "actually influenced the purchasing decisions" of those

5  who bought advertising through www.project632.com.  *Polar Bear Prod., Inc*, 384 F.3d at 711,

6  714; *Mackie v. Rieser*, 296 F.3d 909, 911.  Merely establishing that the Defendant infringed, and

7  that the Defendant profited, are not enough.  *Univ. of Colorado Found. v. Am. Cyanamid*, 196

8  F.3d 1366, 1375 (Fed. Cir. 1999) ("[Plaintiff's] argument presumes that the sales . . . were due to

9  [Defendant's] copyright infringement.  [Plaintiff] had the burden to show this connection.") (cited

10  with approval in *Mackie*, 296 F.3d at 915); *see also Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th

11  Cir. 1983) (nothing that "If General Motors were to steal your copyright and put it in a sales

12  brochure, you could not just put a copy of General Motors' corporate income tax return in the

13  record and rest your case for an award of infringer's profits") (cited with approval in *Mackie*, 296

14  F.3d at 915).

15     Techsavies has not attempted to meet this standard applicable to proving causation of

16  indirect profits.  Techsavies has made no effort to attribute any of its "copyright damages" to this

17  alleged infringement.  As plaintiff, Techsavies "is required to do more initially than toss up an

18  undifferentiated gross revenue number," and has the burden of coming forward with evidence of

19  "gross revenue duly apportioned to relate to the infringement."  *Polar Bear Prods.*, 384 F.3d at

20  711 (quoting 4 Nimmer On Copyright § 14.03[B], 14-39).  Merely establishing a conceivable

21  connection between the infringement and the profits is not enough.  *Bouchat v. Baltimore Ravens*

22  *Football Club*, 346 F.3d 514, 520 (4th Cir. 2003) ("[D]espite the existence of a conceivable link,

23  the plaintiff failed to offer anything more than mere speculation as to the existence of a causal

24  connection between the infringement and the claimed revenues.") (cited with approval in *Polar*

25  *Bear Prods.*, 384 F.3d at 708, 711 n.8).  Even expert opinion on the topic, if not based in actual

26  expertise in marketing and scientific principles, should be discounted.  *Masterson Marketing*, 495

27  F. Supp. 2d at 1050 (rejecting an expert not qualified in marketing or in profits attributable to

28  alleged infringement).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-29-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1    Even if Techsavies could attribute some of www.project632.com's gross profits to the

2    allegedly infringing webpages, any such profits would be vanishingly small, because there are

3    countless non-infringing reasons why a MetroPCS franchisee might patronize

4    www.project632.com here:  a prior relationship with WDFA, the low price of advertising, the

5    possibility of customizing advertising, a referral from MetroPCS corporate, or the ease of setting

6    up a recurring payment.  Apportionment is the jury's responsibility.  *Masterson Marketing*, 495 F.

7    Supp. 2d at 1050.  If the jury is properly restricted to apportioning revenues derived from the look

8    of two webpages, any profits would be trivial.

9    If Techsavies succeeds in demonstrating a causal link between the alleged infringement

10   and WDFA's gross profits, WDFA will then be entitled to present evidence of its expenses,

11   including overhead and production costs.  17 U.S.C. § 504(b); *Frank Music Corp. v. Metro-

12   Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1548 (9th Cir. 1989); *Kamar Int'l, Inc. v. Russ Berrie &

13   Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984).  WDFA will demonstrate that for the entire relevant

14   period, the expenses associated with www.project632.com outweighed any revenues.  Indeed, the

15   entire website—acquiring it and running it—was a business expense for WDFA as opposed to a

16   profit generator.  The same is true for WDFA as an advertising agency.  It has not been profitable

17   since its inception, including the period of alleged infringement.

18   **VII.   TECHSAVIES' PROMISSORY ESTOPPEL CLAIM IS NOT TRIABLE TO A
         JURY**

19
20   Count 5 of Techsavies' complaint is for promissory estoppel.  Promissory estoppel is "a

21   doctrine which employs equitable principles to satisfy the requirement that consideration must be

     given in exchange for the promise sought to be enforced." *Raedeke v. Gibraltar Sav. & Loan

22   Ass'n,* 10 Cal. 3d 665, 672 (1974).  "Under this doctrine a promisor is bound when he should

23   reasonably expect a substantial change of position, either by act or forbearance, in reliance on his

24   promise, if injustice can be avoided only by its enforcement."  *Id.* at p. 672, fn. 1; *accord* 1 B.

25   Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 248, 322-323, pp. 249-251, 302-304.[5]

26
     ---
27   [5] In its order denying WDFA's motion for summary judgment on promissory estoppel, the
     Court noted that "Techsavies pleads this claim as an alternative theory of liability in case the jury
28   finds that there was no contract."  Order at 13 [Docket No. 89] (citing *MZ Ventures LLC v.*
     (Continued…)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-30-                    DEFENDANT AND COUNTERCLAIMANT WDFA
                       MARKETING, INC.'S TRIAL BRIEF;
                       CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

Under California law, there is no right to jury trial on a claim of promissory estoppel.  *C & K Eng'g Contractors v. Amber Steel Co., Inc.*, 23 Cal. 3d 1, 6-7 (1978); *A-C Co. v. Security Pacific Nat. Bank,* 173 Cal. App. 3d 462, 465, 472 (1985) ("a jury trial is not available to plaintiffs whose cause of action is based on the equitable doctrine of promissory estoppel").

Federal law is in accord.  *Nimrod Mktg. (Overseas) Ltd. v. Texas Energy Inv. Corp.*, 769 F.2d 1076, 1080 (5th Cir. 1985) ("Promissory estoppel is an equitable form of action in which equitable rights alone are recognized. Defendants had no right to trial by jury. . . .") (citations omitted), *cert. denied*, 475 U.S. 1047 (1986); *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994) ("Merex's claim is properly regarded as equitable rather than legal and, consequently, that Merex was not entitled to a jury trial on its claim for promissory estoppel.").

## VIII.   TECHSAVIES' CLAIM FOR UNFAIR BUSINESS PRACTICES IS NOT TRIABLE TO A JURY

The third claim in Techsavies' complaint alleges that WDFA violated California's Unfair Competition Law (UCL) (Cal. Bus. & Prof. Code § 17200 *et seq.*) by "agreeing to pay a percentage of the gross revenues generated by said software and then failing to honor said agreement."  (Complaint ¶ 50).  Thus, the UCL claim is based on the same facts as Techsavies' claim for breach of contract.

The UCL authorizes a court to enjoin acts of unfair competition.  Cal. Bus. & Prof. Code § 17203.  Damages are not available under the UCL; the statutory remedy is cumulative of other causes of action, and successful plaintiffs "are generally limited to injunctive relief and restitution." *Cel-Tech Commons, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163, 179 (1999).

The UCL "is a separate equitable cause of action" as to which there is no right to jury trial.  *Hodge v. Superior Court,* 145 Cal.App. 4th 278, 284 (2006).   The Ninth Circuit has expressly held that a claim under the UCL is "not subject to a jury trial."  *Cargill Inc. v.*

*Mitsubishi Motor Sales,* 1999 WL 33597219 at *11 (C.D. Cal. 1999).  If there was consideration for the alleged promise, there is no need to resort to equitable principles, and the law of contracts applies.  *Walker v. KFC Corp.,* 728 F.2d 1215, 1218-1220 (9th Cir. 1984).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-31-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1  *Progressive Dairy Solutions, Inc.*, 362 Fed. Appx. 731, 734-35, 2010 WL 178714 (9th Cir. 2010).

2  Thus, Techsavies' UCL claim should be tried to the Court, and not the jury.

3  **IX.   TECHSAVIES' CLAIM FOR "UNJUST ENRICHMENT" IS PREEMPTED BY THE COPYRIGHT ACT**

4

5  The last claim in Techsavies' complaint alleges that WDFA "has been unjustly enriched by the creation and use of Techsavies' proprietary software."  (Complaint ¶ 67).

6

7  Under California law, "unjust enrichment" is not an independent claim for relief.

8  *Melchior v. New Line Prods., Inc.,* 106 Cal. App. 4th 779, 794 (2003) ("[T]here is no cause of action in California for unjust enrichment."); *see Lauriedale Assoc.s, Ltd. v. Wilson*, 7 Cal. App.

9  4th 1439, 1448 (1992) ("The phrase 'Unjust Enrichment' does not describe a theory of recovery,

10  but an effect: the result of a failure to make restitution under circumstances where it is equitable

11  to do so.").

12  In any event, a state law claim is preempted by the Copyright Act.  The Ninth Circuit

13  utilizes a two-part test to determine whether a state law claim is preempted. A claim is preempted

14  if: (1) the work at issue comes within the subject matter of copyright as described in 17 U.S.C.

15  §§ 102 and 103; and (2) the rights granted under the state law are equivalent to the rights

16  contained in 17 U.S.C. § 106. *See Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137-38 (9th

17  Cir. 2006).  "Copyright preemption is both explicit and broad."  *G.S. Rasmussen & Assoc., Inc. v.*

18  *Kalitta Flying Serv., Inc.*, 958 F.2d 896, 904 (9th Cir. 1992).

19  Techsavies' claim for "unjust enrichment" is based on the same facts as Techsavies' claim

20  for copyright infringement.  Indeed, the claim incorporates the copyright infringement allegations

21  by reference.  (Complaint ¶ 66).  As such, the claim is preempted by the Copyright Act.  *Blue*

22  *Nile, Inc. v. Ice.com, Inc*., 478 F. Supp. 2d 1240, 1250-51 (W.D. Wash. 2007) (finding plaintiff's

23  "unjust enrichment" claim preempted because it is based on the same allegations as the copyright

24  infringement claim).

25  **X.   WDFA'S FRAUD CLAIM**

26  The gravamen of WDFA's fraud claim is Techsavies' false promise that they would

27  "support WDFA's proprietary system," while their true intention was "to claim ownership of the

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-32-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1    system for themselves."   (Counterclaim ¶ 28.)  These promises were material misrepresentations,

2    because Hajjoubi and Conner secretly planned to claim ownership of the system for Techsavies.

3    Techsavies also misrepresented and concealed from WDFA that Techsavies was not willing or

4    able to write the computer code that WDFA needed, and that Techsavies intended to outsource

5    the coding to subcontractors in India who charged a fraction of the amount that Techsavies was

6    charging WDFA.

7         California law has long recognized a cause of action for fraud based on the defendant's

8    making of a contractual promise with no intent to perform.  Cal. Civ. Code § 1710(4*); Service by*

9    *Medallion, Inc. v. Clorox Co.,* 44 Cal. App. 4th 1807, 1816 (1996).  The Ninth Circuit recognized

10   the validity of a fraud claim predicated on a copyright holders false oral promise to transfer

11   ownership of a copyrighted work in *Valente-Kritzer Video v. Pinckney,* 881 F.2d at 772, 776 (9th

12   Cir. 1989).  By alleging that the amount paid was "far in excess of the value of the true services

13   provided," WDFA alleges that it would have acted differently had the extent of the fraud been

14   known at the time of the agreement.  (Counterclaim ¶ 29.)  *Jordan v. Paul Financial, LLC*, 2010

15   WL 2892261, *8 (N.D. Cal. Sept. 30, 2010) ("plaintiffs have sufficiently alleged reliance by

16   stating that the would have behaved differently " had they known the truth.).

17        The huge amount of money paid by WDFA, however, does demonstrate WDFA's reliance

18   on Techsavies' promises.  As pleaded by WDFA, Techsavies' promises induced it to believe that

19   getting Techsavies involved in the project would increase the value of the proprietary system,

20   thereby justifying the expense.  However, if Techsavies secretly planned to discontinue support

21   for the system, disclose the proprietary system to others, and hold WDFA's data hostage, the

22   price would hardly be worth it: after three years at $450,000, WDFA would have no website, a

23   disadvantage relative to its competitors, and no customer data.  A reasonable jury can infer that

24   WDFA would not have agreed to the arrangement had it known Techsavies' true intentions.

25   **XI.    WDFA'S INTERFERENCE CLAIM**

26        Interference with prospective economic advantage occurs where (a) claimant has an

27   economic relationship with a third party with the probability of future economic benefit, (b)

28   defendant knew of the relationship, (c) defendant engaged in intentional, independently wrongful

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-33-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1   acts designed to disrupt the claimant's relationship, (d) the economic relationship was disrupted,

2   and (e) the intentionally wrongful acts caused the disruption.  *Korea Supply Co. v. Lockheed*

3   *Martin Corp.*, 131 Cal. 4th 1134, 1154-55 (2003).

4        WDFA's counterclaim is very straightforward.  Techsavies maintained a database of

5   WDFA's proprietary customer data.  When the relationship between Techsavies and WDFA

6   soured, Techsavies withheld WDFA's customer data in an attempt to extort money from WDFA.

7   Techsavies' refusal to release WDFA's database is akin to misappropriation of a trade secret and

8   constitutes an unfair business practice that meets the definition of an independently wrongful act.

9   *San Jose Construction Inc. v. S.B.C.C., Inc.,* 155 Cal. App. 4th 1528, 1544 (2007)

10  ("'misappropriation' can occur through improper acquisition of a trade secret, not only through

11  use"); *Kasky v. Nike, Inc.,* 27 Cal. 4th 939, 949 (2002) ("unfair competition" is "any unlawful,

12  unfair or fraudulent business act or practice") (citing California Business & Professions Code §

13  17200.)

14       Techsavies interfered with WDFA's present and future business relationship with

15  MetroPCS, by making WDFA's performance "more costly or more burdensome."  *Pacific Gas &*

16  *Electric Co. v. Bear Stearns & Co.,*  50 Cal. 3d 1118, 1129 (1990) (citations omitted).  WDFA

17  was forced to assemble an incomplete and flawed customer database using the limited

18  information that it had on hand.  This project required a huge amount of time and effort, and even

19  then, it was incomplete and rife with errors.

20       WDFA's damages include the expenses incurred in recreating project632.com and the

21  sales revenue that was lost when WDFA had to re-create its customer database.  WDFA's

22  calculation of damages represents a conservative measure of the losses it suffered as a result of

23  Techsavies' actions.

24  ///

25  ///

26  ///

27  ///

28  ///

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-34-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2

1

## XII.    CONCLUSION

2        For all the foregoing reasons, WDFA should prevail on all claims and counterclaims.

3

Dated:  April 8, 2011                                    Crowell & Moring LLP

4

5                                                              /s/

6                                                      J. Daniel Sharp
                                                    Attorneys for Defendant
7                                                  WDFA MARKETING, INC.

8
SFACTIVE 106077.0000001\902268029.2
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-35-

DEFENDANT AND COUNTERCLAIMANT WDFA
MARKETING, INC.'S TRIAL BRIEF;
CASE NO. CV-10-1213-BZ

SFACTIVE 106077.0000001\902268029.2