1  James C. Pistorino (SBN 226496)
   Daniel T. Shvodian (SBN 184576)
2  PERKINS COIE LLP
   3150 Porter Dr.
3  Palo Alto, CA  94304
   Telephone:  (650) 838-4300
4  Facsimile:   (650) 838-4350
   Email:  *jpistorino@perkinscoie.com*
5  Email:  *dshvodian@perkinscoie.com*

6  Attorneys for Plaintiff TECHSAVIES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OFCALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TECHSAVIES, LLC, | No. CV-10-1213 BZ |
| Plaintiff, | **TECHSAVIES, LLC'S PRETRIAL BRIEF** |
| v. | |
| WDFA MARKETING, INC., | Pretrial Conference: April 27, 2011, 3:00 p.m.<br>Courtroom G, 15th Floor<br>Judge:  Hon. Bernard Zimmerman |
| Defendant. | Trial Date:  May 16, 2011 |

# TABLE OF CONTENTS

I.    **INTRODUCTION** .................................................................................................................. 1

II.   **FACTUAL BACKGROUND** ............................................................................................... 2

III.  **STATEMENT OF TECHSAVIES CLAIMS AND DEFENSES** ........................................ 4

   A.   TECHSAVIES CLAIMS ...................................................................................................... 4

      1.   *Copyright Infringement* ................................................................................. 4

      2.   *Copyright Damages*....................................................................................... 5

      3.   *Declaration of Dissolution of Partnership and Accounting*........................ 6

      4.   *Breach of Contract* ....................................................................................... 6

      5.   *Unfair and Unlawful Business Practices, Promissory Estoppel, Unjust Enrichment*.............. 6

   B.   WDFA'S CLAIMS AND DEFENSES ............................................................................... 6

      1.   *WDFA's Affirmative Defenses:* ................................................................... 6

         a.   Implied License ................................................................................. 6

         b.   Joint Authorship ................................................................................ 7

         c.   Waiver and Estoppel.......................................................................... 8

         d.   Copyright Misuse And Unclean Hands............................................. 9

         e.   Breach by Techsavies ...................................................................... 10

      2.   *WDFA's Counterclaims*............................................................................. 10

         a.   WDFA Cannot Prove Any Damages For Any Of Its Counterclaims................. 10

         b.   WDFA's Breach of Contract Counterclaim .................................... 11

         c.   Fraud................................................................................................ 13

         d.   Interference With Business Relations ............................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005) .......................................................... 10

*Ashton-Tate Corp. v. Ross*, 916 F. 2d 516 (9th Cir. 1990) .................................................................. 8

*Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) ...................................................... 7

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
    52 Cal. App. 4th 867 (Cal. App. 4th Dist. 1997) ...................................................................... 17

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ...................................................... 8

*Driscoll v. City of Los Angeles*, 67 Cal. 2d 297 (1967) .......................................................................... 10

*Effects Assoc., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ................................................................ 13

*Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106 (1st Cir. 1993) ................................................ 5

*I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) ............................................................................. 7

*Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140 (9th Cir. 2003) ................................... 4

*Los Angeles News Serv. V. Tullo*, 973 F.2d 791 (9th Cir. 1992) .......................................................... 11

*Nagy v. Nagy*, 210 Cal. App. 3d 1262 (1989) ..................................................................................... 14

*Outboard Marine Corp. v. Superior Court of Sacramento County*,
    52 Cal. App. 3d 30 (1975) ........................................................................................................ 9

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990) ......................................... 16

*Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995) ..................................................... 16

*S.O.S., Inc. v. Payday, Inc.*, 886 F. 2d 1081 (9th Cir. 1989) ...................................................... 8, 9, 13

*Valente-Kritzer Video v. Pinckney*, 881 F.2d 772 (9th Cir. 1989) ........................................................ 12

*Whelan Assocs. v. Jaslow Dental Laboratory*,
    609 F. Supp. 1307 (E.D. Pa. 1985), *aff'd*, 797 F.2d 1222 (3d Cir. 1986) ............................... 8

**Statutes**

17 U.S.C. § 204(a) ............................................................................................................................ 11

17 U.S.C. § 504(a) .............................................................................................................................. 5

17 U.S.C. § 504(b) .............................................................................................................................. 5

Cal. Corp. Code § 16405 .................................................................................................................... 6

Cal. Corp. Code § 16801 .................................................................................................................... 6

**I.   INTRODUCTION**

That WDFA created source code for its replacement website by copy the HTML code from generated from Techsavies' copyrighted code is beyond dispute. For indisputable proof, one needs to look no further than the following comparison of an excerpt of one of the files (index.php):

| Techsavies' Copyrighted Code | WDFA Code |
|---|---|
| ```<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.01 Transitional//EN" "http://www.w3.org/TR/html4/loose.dtd"><html><head><meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1"><title>.::MPCS - Main Login Page::.</title><meta name="Keywords" content="wdfamarketing.com, WDFA Marketing is about successful campaigns, meeting deadlines, treating people well and working hard. We enjoy what we do and want everyone that comes in contact with us to feel the same way."><meta name="Description" content="wdfamarketing.com, WDFA Marketing is about successful campaigns, meeting deadlines, treating people well and working hard. We enjoy what we do and want everyone that comes in contact with us to feel the same way."><meta name="Author" content="AceWebsiteDesign.Com - A Complete IT Web Outsourcing Solutions Provider Company, IT Web Outsourcing Solutions, Custom Web Designer, Ecommerce Website Designer, Custom Shopping Cart Designer, Custom Template Design, Project Management Company, sales@acewebsitedesign.com, Call +1(858)-201-6435"><meta name="language" content="English"><meta name="charset" content="ISO-8859-1"><meta name="resource-type" content="Document"><meta name="distribution" content="Global"><meta name="rating" content="General"><meta name="Expires" content="Never"><meta name="robots" content="index, all, follow"><link rel="shortcut icon" href="images/preview_16x16.png"/><link href="css/styles.css" rel="stylesheet" type="text/css">``` | ```<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.01 Transitional//EN" "http://www.w3.org/TR/html4/loose.dtd"><html><head><meta http-equiv="Content-Type" content="text/html; charset=iso-8859-1"><title>.::MPCS - Main Login Page::.</title><meta name="Keywords" content="wdfamarketing.com, WDFA Marketing is about successful campaigns, meeting deadlines, treating people well and working hard. We enjoy what we do and want everyone that comes in contact with us to feel the same way."><meta name="Description" content="wdfamarketing.com, WDFA Marketing is about successful campaigns, meeting deadlines, treating people well and working hard. We enjoy what we do and want everyone that comes in contact with us to feel the same way."><meta name="Author" content="WDFAMarketing.Com - A Complete IT Web Outsourcing Solutions Provider Company, IT Web Outsourcing Solutions, Custom Web Designer, Ecommerce Website Designer, Custom Shopping Cart Designer, Custom Template Design, Project Management Company, sales@acewebsitedesign.com, Call +1(858)-201-6435"><meta name="language" content="English"><meta name="charset" content="ISO-8859-1"><meta name="resource-type" content="Document"><meta name="distribution" content="Global"><meta name="rating" content="General"><meta name="Expires" content="Never"><meta name="robots" content="index, all, follow"><link rel="shortcut icon" href="images/preview_16x16.png"/><link href="css/styles.css" rel="stylesheet" type="text/css">``` |

In the code excerpt above, the code was copied exactly except WDFA changed the "author" from "AceWebsiteDesign"[1] to "WDFAMarketing." Notably, WDFA left ACE Website Design's contact information in the code. WDFA's "developer" (Mr. Banerjee) has already testified that, at WDFA's direction, he attempted to make an "exact replica" of the Techsavies' code and was instructed to make something "as close as possible" to the Techsavies' code.

Using an administrator login provided by Mr. Prasad, Mr. Banerjee: (1) accessed each file of the Techsavies' code that he was able to; (2) was walked through the site by Mr. Prasad, WDFA's founder and president; (3) viewed the HTML code of the files; (4) provided others assisting him with login access so they could view the Techsavies' code and walked them through the code; (5) that they used the Techsavies' code for all the screen layouts, etc.; and (6) that

---

[1]   AceWebsiteDesign was a company working with Techsavies to develop the software and who assigned their copyrights in the code to Techsavies by written agreement.

utilizing the Techsavies' code saved between one and six months' development time to create the copy.

Thus, the copying is indisputable. What remains to be decided in regard to Techsavies copyright claims is whether WDFA had an excuse for its copying (Techsavies contends that the facts at trial will show that WDFA excuses, such as that it had an implied license, lack merit) and the damages that Techsavies is entitled as a result of that copying.

Techsavies further contends that at the outset of the relationship between Techsavies and WDFA, a partnership was formed and that Techsavies is due an accounting pursuant to that partnership. Alternatively, the parties entered in an oral contract that WDFA subsequently breached and that Techsavies is entitled to damages suffered due to that breach.

## II.   FACTUAL BACKGROUND

Robert Conner and Marouan Hajjoubi are Managing Partners of Techsavies, a company that provides software development and support services to businesses. In 2006, Raj Prasad, the Managing Partner of Defendant WDFA Marketing, Inc. ("WDFA"), contacted Techsavies requesting its services to build a software solution for a new website. The website was to be used as a common platform for MetroPCS cellular phone dealers to order preset advertisement packages. The MetroPCS dealers, who were customers of WDFA, would be able to login to the website running the software and order a particular advertising package. WDFA would then process the order and handle the distribution of the selected advertisements. Mr. Prasad informed Techsavies that WDFA did not have enough money to fully pay Techsavies for the creation and licensing of this software. Instead, Mr. Prasad offered to form a partnership with Techsavies where the gross revenues derived from the software would be split 60/40 in favor of WDFA. Under this partnership agreement, Techsavies would be due 40% of all gross revenue derived from the software.

The parties agreed to this arrangement orally. Relying upon this agreement, Techsavies worked diligently in designing and creating the requested software which they called the "Collateralizer." The Collateralizer software consisted of front-end web pages that could be accessed by MetroPCS dealers, as well as back-end software that would store and process

1  information from the customers. Mr. Hajjoubi subsequently registered the domain name
2  www.project632.com ("the project632 website") to host the Collateralizer software.  Mr. Hajjoubi
3  registered the domain in WDFA's name, but paid for the registration himself.  A company called
4  ACE Website Design ("ACE") assisted Techsavies with the website design.  ACE subsequently
5  assigned all of its rights to the Collateralizer software to Techsavies, and Techsavies currently
6  holds copyright registrations for two versions of the Collateralizer software.  By August 2007, the
7  project632 website was operating with Techsavies' proprietary Collateralizer software.  Mr.
8  Prasad was very pleased with the work, stating he wouldn't "ever forget how much you guys
9  accommodated me and this company when we had nothing."  Since then, the website has
10 generated millions of dollars in revenue for WDFA, but WDFA has not paid Techsavies its fair
11 share of this revenue per the terms of the partnership agreement.  Instead, WDFA has only
12 reimbursed Techsavies a few hundred thousand dollars for certain costs related to maintaining the
13 project632 website and as operating money while Techsavies developed the code.
14          When Techsavies raised this issue with WDFA, WDFA demanded that Techsavies assign
15 all intellectual property rights in the Collateralizer software to WDFA before it would share any
16 of its revenues with Techsavies. Techsavies refused to do so and requested that WDFA honor the
17 parties' original agreement.  While the parties were attempting to negotiate a resolution of this
18 dispute, Mr. Prasad and WDFA secretly hired another software developer, Abhishek Banerjee, to
19 make "an exact replica" of the Collateralizer software so that WDFA would not have to continue
20 its partnership with Techsavies.  Mr. Banerjee in turn brought in a software company in India
21 called Skylark to help with the project, and together he and the Skylark developers examined the
22 Collateralizer source code and copied substantial portions of Techsavies' code to develop the
23 replacement software.  Indeed, Mr. Banerjee freely admitted that he was instructed by Mr. Prasad
24 to develop a software solution that was "just like Project632 – as close to Project632 as possible,"
25 and that to achieve this goal he and the Skylark developers reviewed as much of the Collateralizer
26 source code as they were able to obtain.
27          According to Mr. Banerjee, the copying included reviewing the Techsavies' materials for
28 between 10 and 12 hours over a period of two weeks.  After the initial review, the progressing

1  copy was checked for accuracy with the Techsavies' version in reviews lasting 30 minutes every
2  two weeks. These reviews, in which Mr. Prasad participated, included side-by-side comparisons
3  of the Techsavies version and the WDFA's replacement code.
4      In an initial version of the copy (available through February 2010), WDFA did not change
5  the author information. During his deposition, Mr. Banerjee admitted to having discussions with
6  Skylark about changing AceWebsiteDesign's authorship information and testified:

> So this did come up, and I took the decision to leave that author, to keep that in the code because we weren't – we didn't design – that design wasn't done by me or by us, so I wasn't sure what – whether it was – I wasn't sure whether to, you know, remove that because I didn't want to claim that design for myself, so I did decide to – to leave that authorship the way I found it, so I left a reference to that e-mail address that I – that was there in – in their meta tags.
>
> * * *
>
> I wasn't comfortable pulling out any of the author information.

13  Nevertheless, by March 2010, the "author" field had been changed from
14  "AceWebsiteDesign.com" and replaced with "WDFAMarketing.com." Notably, the WDFA code
15  still contains contact information for ACE ("sales@acewebsitedesign.com. Call +1(858)-201-
16  6435"). Mr. Banerjee testified that he "wasn't sure" how "AceWebsiteDesign" got changed to
17  "WDFAMarketing.com"
18      On November 23, 2009, WDFA took control of the project632 website and unilaterally
19  cut off its relationship with Techsavies. Since then, the project632 website has continued to
20  operate with the copy of the Techsavies' Collateralizer software. On March 23, 2010, Techsavies
21  filed the present action against WDFA.

## III. STATEMENT OF TECHSAVIES CLAIMS AND DEFENSES

### A. Techsavies Claims

#### 1. Copyright Infringement

A copyright registration is prima facie evidence that there is a valid copyright in the registered work and of all the facts contained within the registration. *See Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1144-45 (9th Cir. 2003).

1  In addition, plaintiff must prove access and copying of original elements from the copyrighted work. Infringement may occur upon the copyright of an original work if there is copying from the derivative work of material that appeared in the original work. *See Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1111 (1st Cir. 1993).

In the present case, WDFA had access to the copyrighted work through access to the HTML version of the front-end code. WDFA copied portions of this front end code that also appeared in the original work, i.e., the Collateralizer. That there was copying does not appear to be disputed. Instead, what appears to be disputed is only WDFA's defenses to such copying.

### 2. Copyright Damages

Pursuant to 17 U.S.C. § 504(a), an infringer is liable to the copyright owner for either statutory damages or actual damages and defendants' profits. In the present case, Techsavies has elected to seek its actual damages and WDFA's profits. Pursuant to 17 U.S.C. § 504(b), the copyright owner is entitled to recover actual damages suffered as a result of the infringement and any profits of the infringer that are attributable to the infringement. Moreover, in establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and elements of profit attributable to factors other than the copyrighted work.

In the present case, evidence of the sales through the infringing copy exists in the form of credit card charges made through the infringing copy. In addition, it is known that a user purchase through the website results in a corresponding "co-pay" by MetroPCS to WDFA. For example, for each purchase, MetroPCS may pay an amount less than the purchase amount, and amount equal to the purchase amount, or an amount greater than the purchase amount. In addition, MetroPCS may make co-pays up to a pre-defined limit for a certain market. Using a report of the credit card transactions through the infringing copy, WDFA issues invoices to MetroPCS. However, in the present case, WDFA failed to provide discovery allowing Techsavies to ascertain the amount of the co-pays even in a gross sense as no information was provided for substantial periods of time. Further, in the present case, there is evidence that WDFA earns profits by charging MetroPCS to develop the advertising materials sold through the

infringing copy. But again, WDFA failed to provide discovery allowing Techsavies to ascertain these amounts.

Accordingly, in the present case, once Techsavies presents proof of WDFA's gross revenues, the burden shifts to WDFA to prove offsets, deductions, or that profits were not attributable to the infringement. In the present case, because WDFA has failed to come forward with financial discovery, WDFA cannot show deductions.

### 3. Declaration of Dissolution of Partnership and Accounting

In this case, whether there was a partnership between Techsavies and WDFA and what the terms were is disputed and Techsavies has submitted those issues for resolution by the jury.

In the Complaint, pursuant to Cal. Corp. Code §§ 16405 and 16801, Techsavies also sought a declaration of dissolution of the partnership and an accounting. With regard to dissolution, pursuant to Cal. Corp. Code § 16801(1), Techsavies believes that that the partnership dissolved when at least one half of the partners (WDFA) expressed their will to no longer be involved by sending the termination letter of November 27, 2009. Nevertheless, out of an abundance of caution, Techsavies has sought a judicial declaration of the same in order to resolve any doubt. Techsavies also seeks an accounting.

### 4. Breach of Contract

In the alternative to its partnership claims, Techsavies asserts that there was a contract between Techsavies and WDFA having the same terms are the partnership. Again, WDFA denies that.

Techsavies seeks damages of the same 40% of gross revenues minus printing costs as under the partnership agreement.

### 5. Unfair and Unlawful Business Practices, Promissory Estoppel, Unjust Enrichment

Techsavies believes that these are equitable issues for the Court to decide.

**B.    WDFA's Claims and Defenses**

    **1.    WDFA's Affirmative Defenses:**

        **a.    Implied License**

1   The issue of whether WDFA had an implied license has been extensively briefed to the Court. (*See* Dkt. No. 85.) As set forth in Techsavies' motion for summary judgment, an implied license exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it; and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (*quoting I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)). As discussed in Techsavies' summary judgment motion and during oral argument, WDFA will not be able to present any evidence that the source code was delivered to WDFA. Additionally, the evidence will show that Techsavies never intended that the WDFA copy and distribute its work. Thus, WDFA's defense that it had an implied license to the source code will fail.

### b.  Joint Authorship

As a defense to Techsavies' copyright infringement claim, WDFA has asserted that it is a joint author of the Collateralizer software, and therefore cannot be held liable for infringement. (Dkt. No. 8 (WDFA Answer) at 7:9-11.) WDFA cannot succeed on this defense, however, as the evidence will show that WDFA is not a joint author to the Collateralizer software. "To be an author, one must supply more than mere direction or ideas: one must 'translate[] an idea into a fixed, tangible expression entitled to copyright protection.'" *S.O.S., Inc. v. Payday, Inc.*, 886 F. 2d 1081, 1087 (9th Cir. 1989) (*quoting Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)). In the case of copyrighted software, an individual who provides input regarding the general functions of the software but does not write any of the actual source code is not considered to be a joint author of the work. *See S.O.S.*, 886 F.2d at 1086-87; *see also, Ashton-Tate Corp. v. Ross*, 916 F. 2d 516, 521 (9th Cir. 1990); *Whelan Assocs. v. Jaslow Dental Laboratory*, 609 F. Supp. 1307, 1318-19 (E.D. Pa. 1985), *aff'd*, 797 F.2d 1222 (3d Cir. 1986).

In the present case, there is simply no evidence that WDFA ever contributed any source code that was incorporated into the Collateralizer software. Throughout the development of the Collateralizer software, the source code for the software was maintained on a server controlled by Techsavies. The evidence will show that WDFA never accessed that source code. Indeed, Prasad

1  testified at his deposition as a 30(b)(6) representative of WDFA that no one at WDFA ever wrote
2  any source code for the development of the Project632 website.  Consistent with this fact, WDFA
3  has never identified in this action any lines of source code for the Collateralizer software that
4  were written by WDFA.
5       In response, WDFA argues that it is nevertheless a joint author of the Collateralizer
6  because it provided Techsavies with input regarding the overall design and "look and feel" of the
7  website, as well as the functions that were to be performed by the Collateralizer software.  But
8  this is exactly the type of contribution that the Ninth Circuit held in *S.O.S. v. Payday* was
9  insufficient to establish joint authorship in a copyrighted software program.  Rather than actually
10  writing any code for the software, WDFA's role was limited to providing design ideas for the
11  software and the Project632 website.  These ideas, sent to Techsavies in the form of Photoshop
12  images, PowerPoint presentations, and other non-source code formats, were then translated into
13  the tangible expression of the actual source code that would dictate the operation of the
14  Project632 website.  Under *S.O.S. v. Payday*, such contributions do not make WDFA a joint
15  author to the Collateralizer software.  Thus, WDFA cannot prevail on its joint authorship claim.
16       If WDFA were to prevail on that affirmative defense, Techsavies would be entitled a share
17  of the profits from that software.

### c.   Waiver and Estoppel

19       In its Answer, WDFA raised the affirmative defenses of waiver and estoppel.  WDFA,
20  however, fails to articulate any factual or legal basis for these defenses.  Rather, the entirety of
21  WDFA's allegations on these defenses is as follows:

> Solely by way of an affirmative defense, not to be construed as an admission, the Complaint is barred, in whole or in part, by the doctrine of waiver.
>
> Solely by way of an affirmative defense, not to be construed as an admission, the Complaint is barred, in whole or in part, by the doctrine of estoppel.

(Dkt. No. 8 (WDFA Answer) at 7:17-24.)  Waiver requires: (1) an existing right, benefit, or
advantage; (2) a knowledge, actual or constructive, of its existence; and (3) an actual intention to
relinquish it or conduct so inconsistent with the intent to enforce the right in question as to induce

1  a reasonable belief that it has been relinquished. *Outboard Marine Corp. v. Superior Court of Sacramento County*, 52 Cal. App. 3d 30, 41 (1975). Estoppel requires a showing that: (1) the party to be estopped is apprised of the facts; (2) that party intends that its conduct shall be acted upon, or must so act that the party asserting estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to its injury." *Driscoll v. City of Los Angeles*, 67 Cal. 2d 297, 305 (1967).

The evidence (or lack thereof) will show that there is no evidence to support these required elements for waiver and estoppel. Furthermore, there is no evidence that Techsavies ever made any statement or took any action that could be interpreted as waiving or surrendering any rights with respect to the claims that Techsavies has asserted in this action. Thus, these defenses will fail.

### d. Copyright Misuse And Unclean Hands

WDFA's copyright misuse defense is critically flawed as a matter of law. The entirety of WDFA's copyright misuse allegation is a single sentence in its Answer asserting that "the Complaint for breach of contract is barred, in whole or in part, by the doctrine of copyright misuse." (Dkt. No. 8 (WDFA Answer) at 8:3-5.) The Court has already ruled that copyright misuse is not a defense to a breach of contract claim, which is precisely what WDFA pled. (Dkt. No. 113 at 2:9-16.) *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005).

To the extent that WDFA is allowed to go beyond its pleadings and assert copyright misuse against Techsavies' copyright claim, that is an equitable defense that should be tried to the Court, not the jury. To satisfy that defense, WDFA will have to prove that Techsavies improperly tried to expand the scope of its monopoly. WDFA's claims appear to center around an allegation that Techsavies used its copyright to force WDFA to enter a maintenance agreement or to pay higher fees for that work. But the maintenance work was covered by a separate agreement between the parties, which is evidenced by the fact that the maintenance agreement was entered between the parties despite the fact that the parties could not agree on a written agreement that would cover ownership of the copyrighted source code. WDFA also asserts that WDFA used the existence of its copyright to prevent WDFA from having access to its customer data. The

1  evidence (or lack thereof) will show, however, that WDFA never requested access to any
2  customer data, and that Techsavies never refused any such request. Thus, WDFA's copyright
3  misuse defense will fail.

4  Like copyright misuse, WDFA's defense of unclean hands is an equitable issue that
5  should be tried to the Court, not the jury. Unclean hands is a defense that is only rarely
6  recognized. *Los Angeles News Serv. V. Tullo*, 973 F.2d 791, 799 (9th Cir. 1992). According to
7  WDFA's own proposed jury instruction, WDFA would have to prove that Techsavies' conduct
8  was unconscionable. WDFA can make no such showing, and this defense will therefore fail.

9  **e.     Breach by Techsavies**

10  WDFA has also asserted as an affirmative defense that Techsavies breached the
11  agreement between the parties. As discussed below in conjunction with WDFA's breach of
12  contract counterclaim, the evidence will show that Techsavies did not breach its agreement with
13  WDFA, and that it performed under the agreement up until WDFA launched its version of the
14  website generated from the infringing source code.

15  **2.     WDFA's Counterclaims**

16  WDFA pled three counterclaims in its Answer. In its pretrial filings, however, WDFA has
17  indicated its intent to assert bases for its counterclaims far different than those pled. For the
18  reason set forth in Techsavies' Motion in Limine No. 10, WDFA should be precluded from
19  presenting those new counterclaims. (Dkt. No. 119 at 10.)

20  **a.     WDFA Cannot Prove Any Damages For Any Of Its Counterclaims**
21

22  Even if WDFA is allowed to present its counterclaims, and even if it were to succeed in
23  proving liability, WDFA cannot prove any damages for those counterclaims. As set forth in
24  Techsavies' Motion in Limine No. 2, WDFA failed to produce any of the information and
25  documents to support its damages claims. (Dkt. No. 119 at 2.) And not only will WDFA be
26  unable to present documents and testimony, its expert witness will be unable to rely upon any
27  such information. (Dkt. No. 95 at 10.) Therefore, WDFA will not able to recover any damages
28  for its counterclaims.

### b.    WDFA's Breach of Contract Counterclaim

WDFA's first counterclaim for breach of contract is precluded by law. WDFA asserts that the parties agreed that WDFA would pay Techsavies $30,000 to prepare computer code and provide information technology and that WDFA would remain the owner of the system, including the computer code. WDFA alleges that Techsavies breached the contract by "failing to execute reasonable documentation required by law to memorialize WDFA's ownership of the system, including the computer code commissioned by WDFA from Techsavies." (Dkt. No. 8 (WDFA's Answer) at 13:20-22.) WDFA further alleges that "Techsavies breached the contract by disputing WDFA's ownership of the system, and by refusing to perform [i.e. assign the copyright to WDFA] unless WDFA agreed to pay excessive and exorbitant compensation to Techsavies." (*Id*. at 13:23-25.)

Thus, WDFA claims that Techsavies breached a contract by not taking steps to make WDFA the owner of the disputed computer code. For WDFA to become the owner of the computer code, there had to be a promise to assign the copyright in the code once it was written. And because there was no written agreement between the parties, that agreement would have to have been an oral agreement. Under the Statute of Frauds provision of the Copyright Act, 17 U.S.C. § 204(a), all agreements transferring ownership of copyrights must be made in writing: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Section 204 furthermore bars breach of contract claims based on oral agreements regarding the transfer of copyrights. *See Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 774 (9th Cir. 1989). Thus, WDFA cannot prevail on its breach of contract claim.

While the Court denied Techsavies' motion for summary judgment, the Court's order appears to bebased upon a belief that the copyright in the source code did not come into existence until the copyright was registered with the Patent Office, and that Techsavies was obligated to transfer the ownership of the source code in some other fashion before the copyright registration was filed. But a copyright comes into existence when the work is reduced to a tangible medium.

*See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d at 1085 ("Copyright protection subsists from the moment the work is 'fixed in any tangible medium of expression.'").  So, an agreement to transfer ownership of the source code after it was created, would have been an oral agreement to transfer a copyright, and therefore is unenforceable.  Thus, WDFA cannot prevail on its breach of contract claim.  Further, an oral agreement to transfer the copyright in works not yet created (i.e., a present assignment of an expected future interest) would also be subject to Copyright Statute of Frauds and barred.[2]  Indeed, the Copyright Statute of Frauds was designed to preclude exactly the kind of dispute WDFA raises here, namely going to the courts every time parties disagree as to whether use of a work violates an understanding.  *See Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 556-57 (9th Cir. 1990) (discussing the rationale for the writing requirement).

In its pretrial brief, WDFA has strayed from its pleadings and now appears to intend to argue that Techsavies breached an oral contract in additional ways never previously disclosed.  For example, WDFA now argues that Techsavies breached the oral contract by "secretly executing an Assignment Agreement with Ace Website Design to acquire ownership of the computer code."  Apparently WDFA's new and unpled contention is that Techsavies and WDFA reached an oral agreement that ACE would assign its copyright to WDFA, which would be equally unenforceable under the statute of frauds.  WDFA's second new and unpled basis claim is that Techsavies breached by "disputing WDFA's ownership of the computer code."  This claim is just a reformulated way of WDFA asserting that Techsavies orally agreed to assign the copyright to WDFA.  Otherwise, how else could Techsavies have entered into an agreement whereby it give up its right to claim copyright ownership in the code?

WDFA also indicated that it intends to assert another unpled basis for its breach of contract counterclaim by alleging that Techsavies breached by "withholding WDFA's proprietary customer data."  (Joint Pretrial Stmt. at 4:27-28.)  WDFA does not have a single piece of documentation to support this claim.  Rather, the evidence will show that WDFA secretly

---

[2] For example, an oral agreement that this Court assigns the copyrights in any work it creates in the future would also be barred by the Copyright Statute of Frauds.

TECHSAVIES' PRETRIAL BRIEF                -12-                       Case No. CV-10-1213-BZ

1  prepared its infringing replacement source code, launched the replacement website, and then
2  notified Techsavies that its services were no longer needed.
3        Accordingly, WDFA will not be able to carry its burden to prove that Techsavies breached
4  the oral agreement reached by the parties.

### c. Fraud

Under California law, the elements of fraud are: (1) misrepresentation; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. *See Nagy v. Nagy*, 210 Cal. App. 3d 1262, 1268 (1989). Additionally, a claim of fraud must be pled with particularity.

In its Answer, WDFA pled:

> In or about October 2006, Bob Conner and Marouan Hajjoubi, the managing partners of Techsavies, promised to Raj Prasad of WDFA that Techsavies would provide computer programming services to WDFA in support of WDFA's proprietary system for creating and distributing advertising to metroPCS. Messrs. Conner and Hajjoubi made this promise with the intention to deceive and defraud Mr. Prasad into believing that the services promised by Techsavies would enhance the value of the system to its owner, now WDFA, so that Mr. Prasad and WDFA would act in reliance on the promise. When Messrs. Conner and Hajjoubi made this promise, they knew that it was false, in that Messrs. Conner and Hajjoubi secretly intended to claim ownership of the system for themselves. At the time that Messrs. Conner and Hajjoubi made the promise, Mr. Prasad and others at WDFA were unaware that it was false, and were unaware of Messrs. Conner and Hajjoubi's true intentions.

(Dkt. No. 8 (WDFA Answer) at 14:7-17.) As stated in this paragraph, the apparent misrepresentation by Techsavies was the promise "that Techsavies would provide computer programming services to WDFA in support of WDFA's proprietary system for creating and distributing advertising to metroPCS." But it is undisputed and the evidence at trial will show that Techsavies did in fact provide computing programming services to WDFA, and thus there has been no misrepresentation.

Indeed, WDFA admits in its Answer that Techsavies did provide the programming services requested by WDFA, and merely complains about the amount of money it was charged for these services. (*Id*. at 14:19-20) ("WDFA was induced to pay almost $400,000 to Techsavies,

1  which is far in excess of the true value of the services provided."). That WDFA subjectively
2  believes that it paid too much for Techsavies' services, however, does not give rise to a fraud
3  claim.

4  In addition, WDFA alleges that the promise made by Techsavies "was false, in that
5  Messrs. Conner and Hajjoubi secretly intended to claim ownership of the system for themselves."
6  (Id. at 14:13-15.) This is it yet another attempt by WDFA to recast its assertion of an enforceable
7  oral agreement to assign the copyright in the source code to WDFA. Moreover, Conner and
8  Hajjoubi's intention to claim ownership over the system, whether public or secret, does not make
9  their promise to provide programming services to WDFA false. WDFA's fraud counterclaim as
10 pleaded in its Answer is therefore nonsensical and thus cannot be supported by any evidence at
11 trial.

12 In a newly asserted and unpled basis for its fraud counterclaim, WDFA argues for the first
13 time in the Joint Pretrial Statement that Techsavies "also committed fraud by concealing its
14 intention to outsource the writing of The Collateralizer." (Dkt. No. 136 (Joint Pretrial Stmt.) at
15 5:14-15.) But simply outsourcing work at a lower cost is not actionable as fraud.

16 As to WDFA's asserted damages, WDFA claims that it paid Techsavies almost $400,000,
17 "far in excess of the true value provided." (Dkt. No. 8 (WDFA Answer) at 14:18-20.) WDFA
18 has no evidence that the value of the services received were less that $400,000. WDFA also
19 claims that it was "damaged by disruption of its services to MetroPCS and the loss of advertising
20 sales to MetroPCS, and by incurring the cost of preparing substitute computer code for its system,
21 and in other ways that will be subject to proof at trial." (*Id*. at 14:20-23.) First, there was no
22 disruption in any service or loss of advertising sales to MetroPCS. Second, as discussed in
23 Techsavies' Motion in Limine Nos. 2 and 4, WDFA failed to timely produce evidence of its cost
24 to prepare replacement code, so it will be precluded from presenting any such evidence at trial.
25 And third, WDFA did not timely produce evidence of damages regarding "other ways" in which
26 it was harmed, even if it could introduce such evidence pursuant to such a vague pleading.
27
28

1                     **d.  Interference With Business Relations**

2         WDFA's final counterclaim is that Techsavies interfered with its business relationship with MetroPCS. There is no evidence, however of any interefence with business relations. As an initial matter, there is no such thing under California law as an "interference with business relations" claim as pled in WDFA's Answer. (Dkt. No. 8 (WDFA Answer) at 14:26-15:15.) Rather, California law recognizes two types of business interference claims: 1) intentional interference with contractual relations, and 2) intentional interference with prospective economic advantage. See *Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995). WDFA's Answer alleges an interference with an actual contract, rather than a prospective one, as the Answer refers repeatedly to "an ongoing business relationship between WDFA and its customer, metroPCS" that Techsavies allegedly interfered with. (Dkt. No. 8 (WDFA Answer) at 15:1-9.)

        Under California law, a cause of action for intentional interference with contractual relations requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

        In its Answer, WDFA bases its "interference with business relations" counterclaim on the allegation that "[i]n or about September 2009 and continuing thereafter, Techsavies intentionally and willfully interfered with the business relationship between WDFA and metroPCS by withholding computerized data that franchisees of metroPCS had transmitted to WDFA over the internet by means of the proprietary system at www.project632.com." (Dkt. No. 8 (WDFA Answer) at 15:6-9.) Thus, in order to succeed on its intentional interference with contractual relations claim, WDFA must show that there was some valid contract between WDFA and MetroPCS that Techsavies intentionally disrupted by withholding data regarding MetroPCS franchisees.

There is no such evidence. It is undisputed that WDFA has not alleged in this action that it ever breached any agreement with MetroPCS. WDFA also has not alleged that MetroPCS ever breached any agreement with it in this action. Having made no allegations of any breaches of contract, WDFA's only remaining argument would be that Techsavies' alleged activities caused some sort of disruption of one of WDFA's contracts with MetroPCS. But WDFA has produced no evidence that any contractual relationship with MetroPCS was harmed in any way due to Techsavies' alleged refusal to hand over MetroPCS franchisee data to WDFA. Indeed, there is no evidence that MetroPCS ever complained to WDFA about the alleged loss of data regarding MetroPCS franchisees. In the absence of any such showing, WDFA cannot succeed on an intentional interference with contractual relations claim. *See Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal. App. 4th 867, 878 (Cal. App. 4th Dist. 1997) ("[A] cause of action for intentional interference with contractual relations requires an underlying enforceable contract. Where there is no existing enforceable contract, only a claim for interference with prospective advantage may be pleaded.")

Moreover, Techsavies notes that WDFA designated Raj Prasad as its Rule 30(b)(6) witness on the topic of the factual and legal basis for WDFA's interference counterclaim, and when asked at his deposition what actions Techsavies took that interfered with WDFA's business relationship with MetroPCS, Prasad made no mention of Techsavies' alleged refusal to turn over MetroPCS franchisee data to WDFA. Rather, Prasad identified only Techsavies' refusal to follow through on the alleged oral promise to transfer copyrights and its general "aggression" toward WDFA as constituting interference with WDFA's business. But these alleged acts have nothing to do with any WDFA contract with MetroPCS. Thus, even WDFA's corporate representative could not articulate a coherent theory for WDFA's interference counterclaim.

Finally, while WDFA alleges that it lost sales of advertising materials to franchisees of MetroPCS because of Techsavies' alleged refusal to hand over the franchisee data, WDFA fails to explain how such lost sales were caused by any breach or disruption of any contract between WDFA and MetroPCS. Absent such an explanation, WDFA's allegations regarding lost sales to MetroPCS franchisees are completely irrelevant to its interference counterclaim. Therefore,

WDFA will not be able to support this claim at trial.  Moreover, WDFA did not produce any timely evidence of harm suffered due to this alleged interference, so WDFA will not be able to prove any damages for this claim.

Dated:  April 8, 2011                    By:    */s/ James C. Pistorino*
                                                    James C. Pistorino

James C. Pistorino (SBN 226496)
PERKINS COIE LLP
3150 Porter Ave.
Palo Alto, CA  94304
Telephone:  (650) 838-4300
Facsimile:   (650) 838-4350
Email:  JPistorino@perkinscoie.com

Attorney for Plaintiff
TECHSAVIES, LLC